**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 98-31304
_____

UNITED TRANSPORTATION UNION;
BROTHERHOOD OF LOCOMOTIVE ENGINEERS,

Plaintiffs - Appellees,

ASSOCIATION OF AMERICAN RAILROADS,

Intervenor - Plaintiff - Appellee,

VERSUS

MICHAEL FOSTER, as Governor of the State of Louisiana;
RICHARD IEYOUB, as Attorney General of the State of
Louisiana and as representatives of all other
similarly situated,

Defendants - Appellants.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____
March 17, 2000

Before DAVIS and JONES, and MAGILL,[*] Circuit Judges.

MAGILL, Circuit Judge:

This appeal raises the issue of whether federal law preempts three Louisiana railroad transportation laws. The district court answered this question in the affirmative and granted summary judgment in favor of the appellees, United Transportation Union (UTU)[1], the Brotherhood of Locomotive Engineers (BLE)[2], and the

---

[*] Circuit Judge of the Eighth Circuit, sitting by designation.

[1]UTU is the duly elected collective bargaining representative for the crafts of employees known as trainmen, engineers,
(continued...)

American Association of Railroads (AAR)[3]. Louisiana's Governor and Attorney General (Appellants) appeal the district court's ruling. For reasons to be discussed, we affirm in part and remand to the district court for further proceedings consistent with this opinion.

## I. Background

On May 6, 1998, Louisiana's Governor signed the following three railroad transportation bills into law: 1) Senate Bill No. 26, enacted as Louisiana Revised Statute § 32:661.2 (Act 81), which authorizes Louisiana law enforcement officers to administer post-collision toxicological testing of railroad crews involved in collisions at railroad crossings;[4] 2) Senate Bill No. 30, enacted

(...continued)
conductors, hostlers, switchmen, and yardmen.

[2]BLE is the duly elected collective bargaining representative for the craft of employees known as locomotive engineers.

[3]AAR is an incorporated non-profit trade association whose membership includes freight and passenger railroads. AAR claims that its members operate 77% of the line-haul mileage, employ 91% of the workers, and account for 93% of the freight revenues of all railroads in the United States.

[4]Act 81 provides:

A.(1) Any person who operates a locomotive engine upon the railroad tracks of this state shall be deemed to have given consent, subject to the provisions of R.S. 32:662, to a chemical test or tests of his blood, breath, urine, or other bodily substance for the purpose of determining the alcoholic content of his blood and the presence of any abused or illegal controlled dangerous substance as set forth in R.S. 40:964 in his blood if he is involved in a collision at a railroad crossing at any roadway of this state alleged to have occurred when he was driving or in actual physical control of the locomotive engine while believed to be under the influence of an alcoholic

(continued...)

beverage or any abused or illegal controlled dangerous substance as set forth in R.S. 40:964.

(2)   The test or tests shall be administered at the direction of the law enforcement officer having reasonable grounds to believe the person to have been operating or in physical control of the locomotive engine while under the influence of either an alcoholic beverage or any abused or illegal controlled dangerous substance as set forth in R.S. 40:964.  The law enforcement agency by which such officer is employed shall designate which of the aforesaid tests shall be administered.
.  .  .  .

C.(1)   When a law enforcement officer requests that a person submit to a chemical test as provided for in this Section, he shall first read to the person a standardized form approved by the Department of Public Safety and Corrections.  The department is authorized to use such language as it, in its sole discretion, deems proper, provided that the form does inform the person of the following:

(a)  His constitutional rights under Miranda v. Arizona and subsequent applicable jurisprudence.

(b)  The consequences of his refusal to submit to the chemical test.

(c)  The name and employing agency of all law enforcement officers involved in the detention, investigation, or arrest of the person.

(2)   In addition, the law enforcement officer, after reading the form, shall request the arrested person to sign the form.  If the person is unable or unwilling to sign, the officer shall certify that the arrestee was advised of the information contained in the form and that the person was unable to sign or refused to sign.

D.    If a person refuses the request of the law enforcement officer to submit to a chemical test offered pursuant to the provisions of this Section, a test shall not be given without a court order.  A written report shall be forwarded by the enforcement officer to the United States Department of Transportation.  The report shall state that the officer had reasonable grounds to believe that the person had committed a crime pursuant to

(continued...)

3

as Louisiana Revised Statute § 32:168 (Act 83), which requires the equipping of locomotives with audible signaling devices and requires train operators to use the devices at specified locations;[5] and 3) Senate Bill No. 100, enacted as Louisiana Revised Statute § 32:176 (Act 87), which requires railroad employees to inform state authorities as to whether a train involved in an accident at a railroad crossing possesses an event recorder.[6]

---

(...continued)
the provisions of R.S. 14:98 and that the person had refused to submit to the test upon the request of the peace officer and had been advised of the consequences of the refusal.

La. Rev. Stat. Ann. § 32:661.2 (West 1999).

[5]In relevant part, Act 83 reads:

A.  Every railroad company or person owning and operating a railroad in this state shall equip each locomotive engine with a bell and a whistle or horn which, under normal conditions, can be heard at a distance of not less than one quarter of a mile.

B. Except as specifically exempted by law, any person controlling the motion of an engine on any railroad shall commence sounding the audible signal when such engine is approaching and not less than one quarter of a mile from the place where such railroad crosses any highway.  Such sounding shall be prolonged either continuously or by blasts of the whistle or horn to be sounded in the manner provided by the Uniform Code of Railroad Operating Rules until the engine has crossed the roadway, unless the distance from that crossing to the start of the movement or the distance between the crossings is less than one quarter mile, in which event such warning signals shall be so sounded for the lesser distance.  In cases of emergency said whistles or horn may be sounded in short blasts.

La. Rev. Stat. Ann. § 32:168 (West 1999).

[6]Act 87 provides in pertinent part:

(continued...)

4

On August 17, 1998, BLE and UTU filed a lawsuit seeking pre-enforcement review of Louisiana's newly enacted railroad safety laws. Their complaint alleged the following claims: 1) federal law preempts Acts 81, 83, and 87; 2) Act 81 violates the Fourth Amendment because it allows a Louisiana law enforcement officer who lacks probable cause to administer post-collision toxicological testing to a railroad employee as part of a criminal investigation; and 3) all three acts create an undue burden on interstate commerce. On August 27, 1998, the AAR intervened in the present action. On October 26, 1998, the district court granted summary judgment in favor of the appellees, finding that federal law preempts all three acts, that Act 81 violates the Fourth Amendment, and that Act 83 creates an undue burden on interstate commerce. Based on these findings, the district court permanently enjoined the enforcement of Acts 81, 83 and 87.

## II. Justiciability

### A. Ripeness

---

(...continued)

> Immediately following a railroad crossing accident, the engineer or a responsible member of the crew, if the engineer is unable to provide the information, shall inform the law enforcement officer investigating such accident if the train possesses an event recorder which records and preserves any information which is relevant to the accident or may be of assistance in the investigation of the accident. Upon request of the law enforcement officer, the railroad or its representative shall provide, in a timely manner, any such information contained on the event recorder whose release is not prohibited by federal law, rule, or regulation.

La. Rev. Stat. Ann. § 32:176 (West 1999).

No one has challenged the ripeness of this case for adjudication. However, we must consider possible objections to our Article III jurisdiction sua sponte. See Lang v. French, 154 F.3d 217, 222 (5th Cir. 1998). "[E]very federal appellate court has a special obligation to 'satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review,' even though the parties are prepared to concede it." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 118 S. Ct. 1003, 1013 (1998) (quoting Mitchell v. Maurer, 293 U.S. 237, 244 (1934)).

Article III of the Constitution confines the federal courts to adjudicating actual "cases" and "controversies." U.S. Const. art. III, § 2. In an attempt to give meaning to Article III's "case or controversy requirement", the courts have developed a series of principles termed "justiciability doctrines." One such doctrine that "cluster[s] about Article III" is ripeness. Vander Jagt v. O'Neill, 699 F.2d 1166, 1178 (D.C. Cir. 1983) (Bork, J., concurring). Ripeness separates those matters that are premature because the injury is speculative and may never occur from those that are appropriate for judicial review. See Abbott Lab. v. Gardner, 387 U.S. 136 (1967), overruled on other grounds, Califano v. Sanders, 430 U.S. 99 (1977).

In the present case, appellees bring suit under the Declaratory Judgment Act, 28 U.S.C. § 2201[7], which provides the

---

[7]In relevant part, the Declaratory Judgment Act reads:

(continued...)

6

statutory mechanism for seeking pre-enforcement review of a statute. Declaratory judgments are typically sought before a completed "injury-in-fact" has occurred, see Pic-A-State Pa., Inc. v. Reno, 76 F.3d 1294, 1298 (3d Cir. 1996), but still must be limited to the resolution of an "actual controversy." Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 239-40 (1937). In other words, despite the nature of appellees' action, we will not hear their pre-enforcement challenge unless their suit is ripe for review.[8]

In New Orleans Public Service, Inc. v. Council of New Orleans, 833 F.2d 583 (5th Cir. 1987), we set forth the prevailing standards for determining whether a dispute is ripe for adjudication. We stated:

> A court should dismiss a case for lack of "ripeness" when the case is abstract or hypothetical. The key considerations are "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." A case is generally ripe if any remaining questions are purely legal ones; conversely, a case is not ripe if further factual development is required.

---

(...continued)
> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201 (emphasis added).

[8]This remains true notwithstanding our observation that "[t]he purpose of the Declaratory Judgment Act is to settle 'actual controversies' before they ripen into violations of law or a breach of some contractual duty." Hardware Mut. Cas. Co. v. Schantz, 178 F.2d 779, 780 (5th Cir. 1949).

Id. at 586-87 (internal citations omitted).

B.  Act 81

Appellees allege that federal law preempts Act 81 because the Federal Railroad Administration (FRA) has completely subsumed the subject matter of alcohol and drug testing in the railroad industry.[9]  Appellees also allege that Act 81 offends the Fourth Amendment because it authorizes Louisiana law enforcement officers to administer post-collision toxicological testing to railroad employees as part of a criminal investigation even when the officers lack probable cause.  For reasons to be discussed, appellees argument is entirely too speculative and hypothetical to establish the existence of an Article III "case or controversy." In short, we find that the appellees' pre-enforcement challenge to Act 81 is not ripe for review.

Appellees' challenge sits atop a mountain of conjecture and speculation.  In order for Act 81 to run afoul of the Fourth

---

[9]The FRA has issued numerous regulations which concern the use and possession of alcohol and controlled substances by railroad employees.  For example, 49 C.F.R. § 219.201 sets forth the following circumstances under which mandatory post-accident toxicological testing is required: (1) a major train accident, i.e., any accident involving damage of more than $6,600 in 1998; (2) a reportable injury, i.e., any injury which results in (a) death to any person, (b) injury to any person that requires medical treatment, or (c) any injury to a railroad employee that results in (i) a day away from work, (ii) restricted work activity or job transfer, (iii) loss of consciousness, or (iv) occupation illness of a railroad employee; (3) a fatality to any on-duty railroad employee; or (4) a passenger train accident causing a reportable injury to any person.  Relevant to this case, however, FRA regulations specifically exclude railroad employees from testing "in the case of a collision between railroad rolling stock and a motor vehicle or highway conveyance at a rail/highway grade crossing."  49 C.F.R. § 219.201(b).

8

Amendment, the following train of events would necessarily have to occur: First, a train must be involved in a collision at a Louisiana railroad crossing. Although the law of probability suggests such a collision may be inevitable, we cannot determine with any degree of certainty when such an event will occur. Indeed, the Louisiana legislature may amend Act 81's challenged terminology,[10] or repeal Act 81 it in its entirety, before another locomotive collision at a railroad crossing in Louisiana. Second, even assuming that such a collision occurs, Act 81 does not operate automatically in the event of a collision. Rather, a law enforcement officer must have "reasonable grounds to believe the person to have been operating or in physical control of the locomotive engine while under the influence" of alcohol or other illegal controlled substances. Clearly, there will be many cases where an officer's suspicion does not rise to the level necessary to trigger Act 81's application. Third, "reasonable grounds to believe" would have to be interpreted to mean something other than "probable cause."[11] The appellees ask this court to interpret "reasonable grounds to believe" to mean "reasonable suspicion," a

_____

[10]The parties agree that Act 81 would pass constitutional muster had the Louisiana legislature used the terms "probable cause" instead of "reasonable grounds to believe."

[11]We are particularly concerned with allowing this pre-enforcement challenge to a Louisiana statute where its meaning has not been passed on by any Louisiana state court or been implemented by Louisiana's executive branch. We observe that "reasonable grounds to believe" could be interpreted to mean "probable cause," rather than some lesser form of suspicion. In the absence of an actual controversy, we are reluctant to guess the meaning of a statute lawfully enacted by Louisiana's legislature and signed into law by its governor.

9

level of suspicion clearly below the "probable cause" generally needed to justify a search in a criminal investigation.[12] Finally, a Louisiana officer would have to order such testing without actually having "probable cause."[13] In light of the extreme prematurity of this action, we refuse to allow appellees' Fourth Amendment facial challenge to Act 81.[14]

We are particularly concerned about granting pre-enforcement review in this situation given the slight, if any, harm that appellees may suffer if we withhold review on ripeness grounds. First, assuming the previously outlined train of events actually occurs, Act 81 expressly allows railroad employees to refuse a law enforcement officer's request to undergo toxicological testing. See La. Rev. Stat. Ann. § 32:661.2(D) (West 1999). If an employee refuses an officer's request, Act 81 merely authorizes the law enforcement officer to report this refusal to the Department of Transportation. See id. This potential hardship does not convince us that pre-enforcement review is appropriate in this case.

---

[12]A bodily intrusion resulting from the taking of bodily fluids constitutes a search within the scope of the Fourth Amendment. See Skinner v.Railway Labor Executives' Ass'n, 489 U.S. 602, 617 (1989). To be deemed reasonable, a search generally must be supported by a warrant issued upon probable cause. See National Treasury Employees Union v. Von Raab, 489 U.S. 656, 665 (1989).

[13]We assume, without deciding, that Act 81's predominate purpose is to aid state law enforcement officers in the criminal prosecution of locomotive engineers who operate locomotives while under the influence of alcohol or other illegal controlled substances.

[14]For identical reasons, we find that any conflict between Act 81 and federal law remains entirely hypothetical, and thus, appellees' challenge is not ripe for review.

10

C.  Acts 83 and 87

We find Act 83 ripe for judicial resolution.  Act 83 imposes immediate obligations on the railroad, including potential equipment modifications and operating procedures.  We also find Act 87 ripe for adjudication.  Similar to Act 81, Act 87's requirements depend upon a future railroad collision.  However, unlike Act 81, the only questions we need to decide are purely legal, and thus, are appropriate for judicial review. See New Orleans Pub. Serv., Inc. v. Council of New Orleans, 833 F.2d 583 (5th Cir. 1987).

III.  Preemption

A.  General Preemption Principles

The Supremacy Clause of Article VI of the United States Constitution provides Congress with the power to preempt state law. See U.S. Const. art VI, cl. 2. The Supreme Court has instructed federal courts that the historic police powers of the states are not to be superceded by federal law unless "that was the clear and manifest purpose of Congress." Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947).  In Louisiana Public Service Commission v. FCC, 476 U.S. 355 (1986), the Supreme Court detailed the circumstances when a finding of preemption is appropriate:

> Preemption occurs when Congress, in enacting a federal statute, expresses a clear intent to preempt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the states to supplement federal law, or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress. Preemption may result not only from action taken by

11

Congress itself; a federal agency acting within the scope of its congressionally delegated authority may preempt state regulation.

476 U.S. at 368-69 (citations omitted). In any case, "[t]he critical question is whether Congress intended that federal regulations supersede state law." Id. at 369.

### B. The Federal Railroad Safety Act

The Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20106 (formerly 45 U.S.C. § 434), was enacted "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." 49 U.S.C. § 20101. In order to promote safety at railroad grade crossings, the FRSA provides that the Secretary of Transportation "as necessary, shall prescribe regulations and issue orders for every area of railroad safety supplementing [existing] laws and regulations." 49 U.S.C. § 20103. Congress expressly defined the preemptive scope of any promulgated regulations, stating:

> Laws regulations, and orders related to railroad safety shall be nationally uniform to the extent practicable. A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order, or standard related to railroad safety when the law, regulation, or order– (1) is necessary to eliminate or reduce an essentially local safety hazard; (2) is not incompatible with a law, regulation, or order of the United States Government; and (3) does not unreasonably burden interstate commerce.

49 U.S.C. § 20106.

We have previously observed that "FRSA preemption is even more disfavored than preemption generally." Rushing v. Kansas City S.

12

Ry. Co., 185 F.3d 496, 515 (5th Cir. 1999) (internal citations omitted).[15] The restrictive terms of its preemption provision "indicate[] that pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993) (emphasis added). When applying FRSA preemption, the Court eschews broad categories such as "railroad safety"," focusing instead on the specific subject matter contained in the federal regulation. See id. at 665-75. In sum, when deciding whether the FRSA preempts state laws designed to improve railroad safety, we interpret the relevant federal regulations narrowly to ensure that the careful balance that Congress has struck between state and federal regulatory authority is not improperly disrupted in favor of the federal government.

C. The Locomotive Boiler Inspection Act

The Locomotive Boiler Inspection Act (LBIA), as amended, 49 U.S.C. § 20701, et. seq., grants the United States the power to regulate all "parts and appurtenances" of railroad locomotives. The question of whether Congress intended the LBIA to preempt state regulation of railroad parts and appurtenances was addressed by the Supreme Court in Napier v. Atlantic Coast Line R.R. Co., 272 U.S. 605 (1926), which held that Congress intended the LBIA to "occupy the field" of locomotive equipment regulation. Id. at 613. At

_____

[15]The Supreme Court has observed that the FRSA displays considerable solicitude for state law in that its express preemption provision is both prefaced and succeeded by express saving clauses. See CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 665 (1993).

13

issue in Napier were state regulations prohibiting trains without cab curtains and fire-box doors from operating within the state. Although Congress had not promulgated regulations with regard to either device, the Court held that states were not free to do so themselves. See id. at 613. The Court found that the power delegated to Congress was a "general one" which extended to the "design, the construction and the material of every part of the locomotive and tender and of all appurtenances." Id. at 611. The Court rejected the argument that because the state regulations were intended to address a safety concern not addressed by existing federal regulations, the two regimes did not conflict. Id. at 612. As the Court concluded, state regulations regarding the equipment of locomotives are preempted "regardless of however commendable or however different their purpose." Id. at 613. In short, the LBIA completely preempts the field of locomotive equipment.[16] See id.; see also Missouri Pac. R.R. Co. v. Railroad Comm'n of Tex., 833 F.2d 570, 576 n.7 (5th Cir. 1987) (observing that "[s]tate attempts to prescribe any locomotive safety equipment must necessarily fail."). It is against this backdrop of preemption that we address Appellants' claims.

IV.  Act 83

A. Part A

---

[16]The LBIA creates a uniform national inspection and regulation scheme for locomotive equipment. The advantage of such a scheme is self-evident: locomotive companies need only concern themselves with one set of equipment regulations and need not be prepared to remove or add equipment as they travel from state to state.

14

Act 83, Part A, requires "[e]very railroad company or person owning and operating a railroad in [Louisiana to] equip each locomotive engine[17] with a bell and a whistle or horn which, under normal conditions, can be heard at a distance of not less than one quarter mile." La. Rev. Stat. Ann. § 32:168 (West 1999). Because the LBIA completely preempts the field of locomotive equipment, Part A is clearly invalid. See Napier v. Atlantic Coast Line R.R. Co., 272 U.S. 605, 613 (1926); Missouri Pac. R.R. Co. v. Railroad Comm'n of Tex., 833 F.2d 570, 576 n.7 (5th Cir. 1987) ("State attempts to prescribe any locomotive safety equipment must necessarily fail."). Moreover, because the Secretary of Transportation has promulgated regulations covering the sound capacity of locomotive audible signaling devices, we find that the FRSA also preempts Act 83. Like the district court, we are not persuaded that Act 83 fits within the FRSA's exception for state regulations which address "local safety hazard[s]."[18] Thus, we affirm the district court's ruling that both the LBIA and FRSA preempt Act 83, Part A. We must next determine whether Part B of Act 83 survives this finding.

Under Louisiana law, when a portion of a statute is found to be invalid, a severability analysis is an essential element of judicial review. See Love v. Foster, 147 F.3d 383, 385 (5th Cir.

---

[17]We observe that Act 83 would require railroads to install audible signaling devices on each engine on a multi-engine train. Federal regulations require only the lead locomotive to possess an audible signaling device. See 49 C.F.R. § 229.129.

[18]We agree with the district court that the "locality exception" applies only to local concerns, not state-wide hazards.

15

1998). Louisiana Revised Statute § 24:175, which contains the state's general rule on severability, provides:

> Unless otherwise specifically provided therein, the provisions of each act of the legislature are severable, whether or not a provision to that effect is included in the act. If any provision or item of an act, or an application thereof, is held invalid, such invalidity shall not affect other provisions, items, or applications of the act which can be given effect without the invalid provision, item, or application.

Id. The Louisiana Supreme Court has determined that "[t]he test for severability is whether the unconstitutional portions of the law are so interrelated and connected with the constitutional portions that they cannot be separated without destroying the intention of the legislative body enacting the law." Police Ass'n of New Orleans v. City of New Orleans, 649 So. 2d 951, 965 (La. 1995). Stated simply, the first question is whether the legislature would have passed the statute without the invalid features.

We believe that the Louisiana legislature would have passed Part B without Part A's equipment requirements. Part B is a safety measure designed to signal the presence of an oncoming train so that collisions can be avoided. The Louisiana legislature would obviously want Part B to stand alone if Part A was found to be invalid. Simply put, the Louisiana legislature would have presumably wanted pedestrians or drivers alerted to the presence of an oncoming train, regardless of whether this was accomplished through the sounding of a horn, the ringing of a bell, or the firing of a rifle. Thus, having found Parts A and B severable under Louisiana law, we next determine whether the FRSA preempts

16

Louisiana's signaling requirements.

As previously mentioned, regulations promulgated pursuant to the FRSA require all lead locomotives to be equipped with audible warning devices with a specified minimum decibel level.[19]  See 49 C.F.R. § 229.129.  From this regulation and the fact that the High-Speed Rail Development Act directs the Secretary of Transportation to promulgate regulations governing the sounding of audible warning devices,[20] the Appellees argue that federal law preempts Act 83, Part B.  In short, the Appellees invite us to hold that by issuing regulations covering audible warning equipment, the Secretary intended to bar states from regulating the manner in which such signals are sounded.  We respectfully decline this invitation.

---

[19]We again note that federal regulations require only the lead locomotive to be equipped with an audible signaling device. See 49 C.F.R. § 229.129.  Act 83, however, requires each engine to possess a "bell and horn or whistle." La Rev. Stat. Ann. § 32:168 (West 1999).  Obviously, in the case of multi-engine trains, Louisiana's Act 83, Part A, imposes additional equipment requirements on railroads.

[20]The High-Speed Rail Development Act, as amended, directs the Secretary of Transportation to promulgate regulations requiring the sounding of a locomotive horn at every crossing:

> The Secretary of Transportation shall prescribe regulations requiring that a locomotive horn shall be sounded while each train is approaching and entering upon each public highway-rail grade crossing.

49 U.S.C. § 20153(b).  The Secretary has not, however, promulgated such regulations.  Perhaps Congress can preempt a field simply by invalidating all state and local laws without replacing them with federal laws, but the High-Speed Rail Development Act discloses no such intent.  Directing the Secretary of Transportation to preempt a field is not the same as preempting a field; here, Congress has done the former.  The parties agree that once the Secretary prescribes such regulations, an event which appears imminent, Act 83 will be preempted in its entirety.

17

The FRSA speaks clearly to a state's authority to regulate railroad safety:

> A State may adopt or continue in force a law, regulation, or order related to railroad safety until the Secretary of Transportation prescribes a regulation or issues an order covering the subject matter of the state requirement.

49 U.S.C. § 20106. Although the Secretary has issued regulations covering the sound capacity of audible signaling devices, we find that these regulations neither "cover" nor "substantially subsume" regulations governing when such devices are sounded.[21] See Rushing v. Kansas City S. Ry. Co., 185 F.3d 496, 515 (5th Cir. 1999). Although our decision in Rushing addressed whether the FRSA preempts state common law nuisance claims, we find the reasoning equally applicable to the instant case:

> A sound capacity safety regulation does not subsume regulations on when whistles are sounded. Although the state likely could not ban the sounding of whistles by banning them altogether, because it would defeat the purpose of the whistle capacity provision, it can impose restrictions on when they are sounded.

Id. at 516 (emphasis added) (internal citations omitted); see also Southern Pac. Transp. Co. v. Public Util. Comm'n of Or., 9 F.3d 807 (9th Cir. 1993) (distinguishing between whistle capacity and whistle use, and holding that federal regulations governing the former do not preempt the latter). Thus, we find that Act 83, Part B, is not preempted by federal law.

---

[21]We realize that state regulations governing the manner in which signaling devices are used may require railroads to equip their trains with parts not required by federal regulations. We are not confronted with such a situation in this case, and thus, we refuse to decide whether such regulations would be preempted by the LBIA or FRSA.

18

B.  Part B

Having found that federal law does not preempt Act 83, Part B, we must determine whether Part B places an undue burden on interstate commerce.  Instead of addressing this specific question, the district court focused on the <u>combined effect</u> of Part A and Part B on interstate commerce, finding that Act 83 would require railroads to stop at state boundaries and make equipment changes.

The parties never really addressed this issue until oral arguments, at which time they indicated that meeting Part B's requirements would require railroads to relocate their "whistle posts," i.e., the posts that advise the engineers when to sound their whistles.[22]  At oral argument, appellees argued that this requirement would create an undue burden on interstate commerce.  Appellants argue that Act 83 meets the test laid down by the Supreme Court in <u>Pike v. Bruce Church, Inc.</u>, 397 U.S. 137 (1970).[23]  Appellants also argue that Act 83's effect on interstate commerce cannot be determined without additional fact-finding by the district court.  We agree.

---

[22]The district court also found that Act 83 would require railroads to alter their whistle posts.  The district court used this latter finding of potentially "irreparable injury" to justify its preliminary injunction against enforcement of Act 83.  The district court did not, however, specifically find that requiring railroads to relocate their whistle posts would create an undue burden on interstate commerce.

[23]In <u>Pike</u>, the Supreme Court held that where a state statute regulates even-handedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits. 397 U.S. 137, 141 (1970)

Unlike the district court, we are unable to determine on the basis of an empty record whether forcing railroads to comply with Part B alone would create an undue burden on interstate commerce. Because neither the parties nor the district court seem to have given this issue much thought, and because the record is devoid of any evidence that could help us decide this issue, we remand to the district court for a determination of this issue.

## V.  Act 87

In the event of a railroad crossing collision involving a locomotive, Act 87 requires railroad employees to notify the law enforcement officer investigating the accident of the existence of an event recorder on the train. See La. Rev. Stat. Ann. § 32:176 (West 1999). Upon request of the investigating law enforcement officer, the railroad is also directed to release any information contained on the event recorder to the extent allowed by federal law. See La. Rev. Stat. Ann. § 32:176 (West 1999). For reasons to be discussed, we find that the district court correctly found that federal regulations preempt Act 87.

In 1994, Congress directed the Secretary of Transportation to promulgate regulations and issue orders to enhance safety by requiring that a train be equipped with an event recorder. See 49 U.S.C. § 20137. Pursuant to this requirement, the FRA has promulgated regulations specifically covering the requirements for an event recorder. See 49 C.F.R. §§ 229.5, 229.25, 229.135. Among other provisions, the regulations require that a railroad whose locomotive is involved in an accident shall preserve the recorded

20

data for analysis by the FRA or National Transportation Safety Board (NTSB). See id. The regulations also provide, however, that information contained on the event recorders "shall not be utilized for analysis or any other purpose except by direction of the FRA or NTSB." See 49 C.F.R. § 229.135(d)(1). We agree with the district court that the Secretary has issued regulations governing the use of information on event recorders that clearly preempt Act 87.[24]

## VI.

To summarize, we AFFIRM the district court's finding that federal law preempts Act 87 and Part A of Act 83, and REMAND for a determination of whether Part B of Act 83 creates an undue burden on interstate commerce. Finally, we find that the appellees' challenge to Act 81 is not ripe for judicial review.

AFFIRMED IN PART AND REMANDED.

---

[24]The practical effect of our holding may be limited. States will remain free to investigate potential violations of their criminal statutes through traditional means, including subpoenaing the information from the proper officials. Federal regulations provide that:

> Nothing in this section is intended to alter the legal authority of law enforcement officials investigating potential violation[s] of State criminal law[s].

49 C.F.R. § 229.135. States cannot, however, impose the affirmative duty on railroad employees to seek out state law enforcement officers and notify them of the existence of an event recorder and disclose information contained therein. Federal regulations preempt such requirements.

21