**MILLER EXPLORATION COMPANY,**

v.

**ENERGY DRILLING COMPANY.**

No. Civ.A. 99–0802.

United States District Court,
W.D. Louisiana,
Alexandria Division.

Jan. 3, 2001.

---

782

Philip D Nizialek, Teresa L DeFord, Rathwell & Nizialek, The Woodlands, TX, for Miller Exploration Co.

Joseph C Giglio, Jr, Paul M Jones, Kyle P Polozola, Liskow & Lewis, Lafayette, LA, for Energy Drilling Co.

## *RULING*

LITTLE, Chief Judge.

Before the court are defendant Energy Drilling Company and plaintiff Miller Drilling Company's cross motions for summary judgment. Both motions are granted in part and denied in part. We also grant in part and deny in part Miller's motion to strike portions of the declarations submitted by Energy.

### I.

In the fall of 1998, Miller hired Energy to drill a well on land in Catahoula Parish, Louisiana. Energy began work on 30 September 1998. Energy's drilling rig was installed on a site designated by Miller, as provided by the parties' contract. A different contractor installed a conductor pipe for the well, to prevent surface and sub-soil erosion. On 2 October 1998, the well was spudded, meaning that drilling began. The next day, the well went out of control when a "blowout" occurred, that is, pressure built up underground causing soil and water to spew from the conductor pipe. The resulting erosion of the surface and subsurface soil formed a crater under the rig, and it fell over the next morning. Energy salvaged portions of the rig and rebuilt it, but some parts were damaged beyond repair, and other parts fell into the crater and were never retrieved. The cost of repairs exceeded the $900,000 provided by Energy's insurer. Miller sent a written notice of termination to Energy, dated 5 November 1998 and received on 10 November 1998.

Miller seeks a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the company need not pay: (1) the cost of replacing drill pipe lost in the accident; (2)

the cost of replacing Energy's rig, in excess of Energy's insurance coverage; or (3) daywork wages at the force majeure rate of $4,500 per day for each day from 5 October 1998 to 18 January 1999.

Energy's cross claim suggests Miller must pay: (1) the cost of replacing the drill pipe; (2) the cost of repairs to the rig in excess of the amount paid by Energy's insurer; (3) the normal daywork rate for the days 3 October 1998 through 10 November 1998, plus the force majeure rate for an additional seventy-nine days; and (4) penalties, interest and attorney fees.

Louisiana law applies. Miller and Energy used a form contract prepared by the International Association of Drilling Contractors (IADC), with minor customizations. Miller is the "operator" and Energy is the "contractor".

## II.

28 U.S.C. § 2201(a) provides: "any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." Declaratory relief is only available when a substantial controversy of sufficient immediacy and reality exists between parties with adverse legal interests. *See Middle S. Energy Inc. v. City of New Orleans*, 800 F.2d 488, 490 (5th Cir.1986). The court may act if capable of providing specific relief through a decree of conclusive character, but cannot issue an opinion advising the parties of what the law would be upon a hypothetical state of facts. *See United Trans. Union v. Foster*, 205 F.3d 851, 857 (5th Cir.2000). A case is generally ripe if the questions remaining are legal, while the acts potentially giving rise to liability have already occurred. *See id.* In the current matter, the accident and damages at issue have already occurred, most of the facts are known, and the rights and liabilities of the parties may now be determined.

## III.

Summary judgment is granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, when viewed in the light most favorable to the non-movant, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute about a material fact is genuine if the evidence allows a reasonable jury to return a verdict for the non-moving party. *See Anderson*, 477 U.S. at 268, 106 S.Ct. 2505; *Stewart v. Murphy*, 174 F.3d 530, 533 (5th Cir.1999).

The substantive law determines what facts are material. Rule 56 mandates summary judgment in any case in which the party with the burden of proof fails to establish an essential element of his case. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Washington v. Armstrong World Indus.*, 839 F.2d 1121, 1123 (5th Cir.1988); *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir.1986). The party opposing a motion for summary judgment must present evidence creating more than a metaphysical doubt about the material facts or a theoretical possibility that his claim is good. *See Pennington v. Vistron Corp.*, 876 F.2d 414, 426 (5th Cir.1989); *Washington*, 839 F.2d at 1123; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Allegations in the pleadings, naked assertions of factual disputes and conclusory allegations are not sufficient. *See Solo Serve Corp. v. Westowne Assocs.*, 929 F.2d 160, 165 (5th Cir.1991); *Herrera v. Millsap*, 862 F.2d 1157, 1160 (5th Cir.1989); *Fontenot*, 780 F.2d at 1195–96.

## IV.

Before we consider the substance of this case, we consider Miller's motion to strike

portions of the declarations Energy submits in support of its motion and in opposition to Miller's. We grant the motion to strike as to paragraphs 13 and 14 of Don A. Bazer's declaration but deny the motion as to the declaration of Pat Burns, Jr.

▇ Rule 56(e) of the Federal Rules of Civil Procedure provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."

▇ Burns' declaration meets the requirements of Rule 56(e). Burns personally observed the situation at the Catahoula site. His statement does contain assertions about what caused the crater, but he provides a sufficient description of what he saw to support his conclusions. Burns is an Energy employee and therefore has an interest in the outcome of this litigation, but witness credibility is not relevant to the determination of a motion for summary judgment.[1] We find no reason to exclude any portion of Burns' declaration.

▇ Paragraphs 13 and 14 of Bazer's declaration contain conclusory statements and as such do not meet the requirements of Rule 56(e). They also are not acceptable as expert opinions. An expert's affidavit must contain factual support for the opinions expressed and must explain the reasoning process underlying the opinion. *See Boyd v. State Farm Ins. Cos.,* 158 F.3d 326, 331 (5th Cir.1998). Bazer's affidavit lists his qualifications and lists the materials he reviewed in forming his opinions, which are then stated in a purely conclusory fashion in paragraphs 13 and 14. There is no explanation whatsoever of what Bazer understood the facts to be or of how he arrived at his opinion. Accordingly, we do not rely upon paragraphs 13 or 14 of his declaration in the analysis that follows.

---

**1.** Rather, the evidence is considered in the light most favorable to the non-movant. *See Lindsey v. Prive Corp.,* 987 F.2d 324, 327 & n.

## V.

### A.

▇ "When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent." La.Civ.Code Ann. art.2046. A court cannot look beyond the document itself in order to determine the intent of the parties. *See American Totalisator Co., Inc. v. Fair Grounds Corp.,* 3 F.3d 810, 813 (5th Cir.1993); *Amend v. McCabe,* 664 So.2d 1183, 1187 (La.1995). Extrinsic evidence and interpretive theories may only be used to determine intent when the writing itself is ambiguous or otherwise unclear. *See Lloyds of London v. Transcontinental Gas Pipe Line Corp.,* 101 F.3d 425, 428 (5th Cir.1996). The words of a contract are given their generally prevailing meaning, except that words of art and technical terms used in a contract regarding a technical matter are given their technical meaning. *See* La.Civ.Code Ann. art. 2047; *Schroeder v. Bd. of Supervisors,* 591 So.2d 342, 345 (La.1991). The words of the IADC contract are clear and the results of their application are reasonable.

### B.

▇ As to the lost drill pipe, paragraphs 14.1 and 14.2 of the IADC contract provide the applicable rule:

14.1 Contractor's Surface Equipment: Contractor shall assume liability at all times for damage to or destruction of Contractor's surface equipment, regardless of when or how such damage or destruction occurs, and Contractor shall release Operator of any liability for any such loss, except loss or damage under the provisions of Paragraphs 10 or 14.3.

14.2 Contractor's In–Hole Equipment: Operator shall assume liability at all times for damage to or destruction of

---

14 (5th Cir.1993). In this case this is somewhat complicated because both parties move for summary judgment.

Contractor's in-hole equipment, including, but not limited to, drill pipe, drill collars, and tool joints, and Operator shall reimburse Contractor for the value of any such loss or damage, the value to be determined by agreement between Contractor and Operator as current repair costs or 100 percent of current new replacement costs of such equipment delivered to the well site.

The contractor himself is responsible for his surface equipment, and the operator, Miller, is responsible for the in-hole equipment. Paragraph 14.2 lists "drill pipe" as an example of in-hole equipment, and accordingly Miller must reimburse Energy for the lost pipe.

Miller suggests it is not responsible for the drill pipe because the equipment was not actually inside the hole when destroyed. The contract, however, provides no exception based on the location of the equipment at the time of damage or destruction. Miller still must reimburse Energy's loss.

### C.

■■■ Next, we consider the damage to Energy's drilling rig. Paragraph 10 of the contract provides an exception to paragraphs 14.1 and 14.2:

10. SOUND LOCATION

Operator shall prepare a sound location adequate in size and capable of properly supporting the drilling rig, and shall be responsible for a conductor pipe program adequate to prevent soil and subsoil wash out. It is recognized that Operator has superior knowledge of the location and access routes to the location, and must advise Contractor of any subsurface conditions, or obstructions (including, but not limited to, mines, caverns, sink holes, streams, pipelines, power lines and telephone lines) which Contractor might encounter while en route to the location or during operations hereunder. In the event subsurface conditions cause a catering or shifting of the location surface, or if seabed conditions prove unsatisfactory to properly support the rig during marine operations hereunder, and loss or damage to the rig or its associated equipment results therefrom, Operator shall, without regard to other provisions of this Contract, including Paragraph 14.1 hereof, reimburse Contractor to the extent not covered by Contractor's insurance, for all such loss or damage including payment of force majeure rate during repair and/or demobilization if applicable.

If "any sub-surface conditions cause a catering or shifting of the location surface" the operator must reimburse the contractor for damage to his equipment.

The accident at issue in this case occurred when an underground pressure buildup caused a blowout, that is, water and subsoil rapidly moved to the surface. As a result, the surface soil and subsoil collapsed forming a crater. Energy's rig was damaged when it sank into the crater.

The blowout and crater are both attributable to underground pressure conditions. The blowout and crater were not caused by something that happened above ground or on account of an error on the part of either party. The blowout cannot be seen as a separate and intervening cause of the crater and resulting damage to the rig. The contract does not relieve the operator of responsibility in instances in which a blowout accompanies catering or shifting of the surface. Paragraph 10 applies and Miller, the operator, must reimburse Energy for the repair expenses in excess of Energy's insurance coverage.

Paragraph 10 is not limited to situations in which the operator has the ability to prevent an accident by choosing a different location or warning the contractor of the danger. The first portion of the paragraph indicates that the operator is responsible for selecting an appropriate location for the rig and for warning the contractor of potential obstacles beneath the surface. The second portion of the paragraph makes the operator liable for damage caused by subsurface conditions, and does not indicate that this liability is

limited to situations in which the operator also must warn the contractor of a condition or select a different site. It does not matter that a blowout, unlike, for instance, a nearby mine or pipeline, is something the operator is not obligated to warn the contractor about before drilling begins. Miller must reimburse Energy's uninsured repair expenses on the drilling rig.[2]

**D.**

 Force majeure typically appears as a defense offered by a party who fails to perform a contract because an act of God or other uncontrollable event prevents performance. *See Matador Drilling Co., Inc. v. Post,* 662 F.2d 1190, 1197–98 (5th Cir.1981); *Saden v. Kirby,* 660 So.2d 423, 428 (La.1995).[3] In the current matter, however, paragraph 10 allows Energy to claim daily payments at the force majeure rate "during repair and/or demobilization if applicable," should the drilling rig or associated equipment be damaged in the way described above. Paragraph 4.7 establishes the rate at $4,500 per twenty-

**2.** Paragraph 14.10 applies to liability for stopping a wild well and cleaning up associated debris:

14.10 Liability for Wild Well: Operator shall be liable for the cost of regaining control of any wild well, as well as for cost of removal of any debris, and shall release Contractor of, and Operator shall protect, defend and indemnify Contractor from and against any liability for such cost.

A wild well is one undergoing a blowout, but paragraph 14.10 deals only with liability for cleanup and stopping the blowout, which is not at issue in this case.

**3.** Paragraph 17 of the IADC contract outlines the situations in which the force majeure day rate is generally available:

17. FORCE MAJEURE:
Neither Operator nor Contractor shall be liable to the other for any delays or damages or any failure to act due, occasioned or caused by reason of any laws, rules, regulations or orders promulgated by any Federal, State, or Local governmental body or the rules, regulations, or orders of any public body or official purporting to exercise authority or control respecting the op-

four hour period during which normal operations are suspended:

4.7 Force Majeure Rate: $4500.00 per twenty-four (24) hour day for any continuous period that normal operations are suspended or cannot be carried on due to conditions of force majeure as defined in Paragraph 17 hereof. It is, however, understood that subject to Paragraph 6.3 below, Operator can release the rig in accordance with Operator's right to direct stoppage of the work, effective when conditions will permit the rig to be moved from the location.

Initially it seems that paragraphs 10 and 4.7, in combination, entitle Energy to receive the force majeure rate during the time the rig was being repaired. Paragraph 10 states the payments may be available and paragraph 4.7 establishes the rate. The second sentence of paragraph 4.7, however, allows Miller to terminate the contract under paragraph 6.3:

6.3 Early Termination
(a) By Either Party: Upon giving of written notice either party may termi-

erations covered hereby, including the procurance or use of tools and equipment, or due, occasioned or caused by strikes, action of the elements, water conditions, inability to obtain fuel or other critical materials, or other causes beyond the control of the party affected thereby. In the event that either party hereto is rendered unable, wholly or in part, by any of these causes to carry out its obligation under this Contract, it is agreed that such party shall give notice and details of Force Majeure in writing to the other party as promptly as possible after its occurrence. In such cases, the obligations of the party giving the notice shall be suspended during the continuance of any inability so caused except that Operator shall be obligated to pay to Contractor the Force Majeure Rate provided for in Paragraph 4.7 above.

The day rate is not available under paragraph 17 in this case. Miller does not accuse Energy of such a failure to perform and there is no evidence that Energy notified Miller of its intent to invoke this clause, which is a prerequisite to obtaining payments under this paragraph. *See Matador,* 662 F.2d at 1197–98 (applying similar contract in case in which drill pipe was stuck in hole for several weeks).

nate this Contract when total loss or destruction of the rig, or a major breakdown with indefinite repair time necessitate[s] stopping operations hereunder. Miller sent Energy a written termination notice, dated 5 November 1998 and received on 10 November 1998. Energy's drilling rig was seriously damaged by the blowout and accompanying catering, so Miller's termination of the contract in this case was appropriate under paragraph 6.3. Paragraph 6.4(c) explains what compensation the contractor is to receive when the operator terminates the contract after the well is spudded, as here:

> (c) Subsequent to Spudding: If such termination occurs after the spudding of the well, Operator shall pay Contractor (1) the amount for all applicable daywork rates and all other charges and reimbursements due to Contractor: but in no event shall such sum, exclusive of reimbursements due, be less than would have been earned for 5 days at the applicable day rate "Without Drill Pipe" and the actual amount due for drill pipe used in accordance with the above rates: or (2) at the election of Contractor and in lieu of the foregoing. Operator shall pay Contractor for all expenses reasonably and necessarily incurred and to be incurred by reason of this Contract and by reason of such premature termination plus a lump sum of $ N/A provided, however, if this Contract is for a term of more than one well or for a period of time, Operator shall pay Contractor, in addition to the above, the force majeure rate less any unnecessary labor from the date of termination until the end of the term.

The wages due to Energy are restricted to the amount available under paragraph 6.4(c). To make the force majeure rate available during the entire period of repair would mean that Miller's termination, which was proper under the circumstances, would have no effect. Miller would pay as much as it would if it had not terminated the contract. The parties have not yet demonstrated the amount Miller owes Energy under paragraph 6.4.[4]

## VI.

For the reasons given above, summary judgment is granted in part and denied in part for each party in this matter. Plaintiff Miller must pay defendant Energy for (1) the drill pipe lost in the accident; (2) the damage to Energy's rig, to the extent not covered by insurance; and (3) early termination compensation as provided by paragraph 6.4(c) of the IADC contract. The exact dollar amounts, and any responsibility for penalties, attorney fees, and interest have not been established by either party.

---

4. Miller's position is that it need only pay Energy the amount due under paragraphs 6.4(c)(1), which is $7,200 for one day's work with drill pipe, plus four days' work without at $7,100 per day. Energy suggests that the termination was not effective until 10 November 1998, and that therefore Miller should pay the normal day rates through 10 November 1998 and the force majeure rate thereafter. Energy is not entitled to the force majeure rate for such a long period, but the effect of the time of the termination, and the appropriate amount due for daywork prior to the termination are still unestablished.