[No. B200777. Second Dist., Div. Three. June 3, 2008.]

SOUTHERN CALIFORNIA REGIONAL RAIL AUTHORITY et al.,
Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
JAMES TUTINO et al., Real Parties in Interest.

**COUNSEL**

Randolph Cregger & Chalfant, Joseph P. Mascovich; Cummins & White, James R. Wakefield; Sims Law Firm and Michael E. Murphy for Petitioners.

Landman Corsi Ballaine & Ford, Ameet B. Kabrawala and William G. Ballaine for National Railroad Passenger Corporation as Amicus Curiae on behalf of Petitioners.

Kirkpatrick & Lockhart Preston Gates Ellis, Raymond E. Loughrey; and James LaRusch for American Public Transportation Association as Amicus Curiae on behalf of Petitioners.

Louis P. Warchot, Daniel Saphire; Ernster Law Offices, John H. Ernster and Ryan K. Marden for Association of American Railroads as Amicus Curiae on behalf of Petitioners.

Hanson Bridgett Marcus Vlahos & Rudy, David J. Miller, Michael N. Conneran, Kimon Manolius and Warren R. Webster for Peninsula Corridor Joint Powers Board (Caltrain) as Amicus Curiae on behalf of Petitioners.

O. J. Solander, Matthew B. George and Bruce A. Behrens, Chief Counsel, Thomas C. Fellenz, Deputy Chief Counsel, and Ronald W. Beals, Assistant Chief Counsel, for State of California Department of Transportation as Amicus Curiae on behalf of Petitioners.

Best Best & Krieger, C. Michael Cowett and Paula C. P. de Sousa for North County Transit District as Amicus Curiae on behalf of Petitioners.

Neumiller & Beardslee, Thomas J. Shephard, Sr., John W. Stovall and Jeremy B. Price for San Joaquin Regional Rail Commission as Amicus Curiae on behalf of Petitioners.

No appearance for Respondent.

Ringler Kearney Alvarez, Jerome L. Ringler, Thomas A. Kearney, Richard L. Rosett; Esner, Chang & Ellis and Stuart B. Esner for Real Parties in Interest.

Arkin & Glovsky and Sharon J. Arkin for Consumer Attorneys of California as Amicus Curiae on behalf of Real Parties in Interest.

**OPINION**

**KLEIN, P. J.**—This petition for writ of mandate arises out of the January 26, 2005 commuter train derailment incident near Glendale, California. Approximately 100 plaintiffs consisting of passengers, railroad workers and their survivors, brought a consolidated wrongful death and personal injury lawsuit against petitioners Southern California Regional Rail Authority doing business as Metrolink and the Los Angeles County Metropolitan Transit Authority (collectively referred to as Metrolink). The only issue presented at this juncture in the case is whether federal regulations preempt plaintiffs' claim Metrolink was negligent by reason of operating one of the trains involved in the incident in push mode, i.e., with the locomotive at the rear of the train and an occupied cab car in the lead. A cab car has seats for passengers and a control cab from which the engineer can operate the train.

We first provide an overview of the case, the trial court's ruling and our holding. In the Facts and Procedural Background that follows the overview, we detail the federal regulatory process that resulted in the promulgation of "Passenger Equipment Safety Standards" in 1999. We also consider the trial court's ruling in greater detail and the developments subsequent to it. In the Discussion section, we apply the express preemption provision found at title 49 United States Code section 20106(a)(2) and conclude federal regulations that address the construction of cab cars and permit the use of an occupied

cab car in the lead position of a Tier I commuter train, i.e., one operating at speeds below 125 miles per hour, preempt plaintiffs' claim Metrolink was negligent in that regard.

We therefore grant the writ petition and issue a peremptory writ of mandate directing the trial court to vacate its order holding to the contrary.

## OVERVIEW OF THE CASE AND OUR HOLDING

1. *The derailment.*

On the morning of January 26, 2005, an individual operating a sports utility vehicle (SUV) turned onto the railroad right-of-way at the grade crossing at Chevy Chase Road in Glendale, California. The driver proceeded down the right-of-way adjacent to the tracks for 150 feet before turning onto the tracks, stopping the SUV on the tracks and dousing the interior of the SUV with gasoline. Moments later, Metrolink Train 100, a commuter train being operated in push mode, struck the SUV and derailed. Train 100 struck a parked freight locomotive, then collided with Metrolink Train 901, a locomotive-led commuter train travelling in the opposite direction. The rear end of the cab car of Train 100 struck the side of passenger cars in Train 901, crushing occupied areas of that train. The incident resulted in eight fatalities in Train 100, three fatalities in Train 901 and many injuries.[1]

2. *Plaintiffs' allegations of negligence in the use of push mode.*

Plaintiffs' operative pleading, the second amended master allegations (SAMA), includes a cause of action against Metrolink for negligence based on the operation of Train 100 in push mode in an urban area with multiple grade crossings. The SAMA asserts Metrolink "knew or should have known . . . there was significant risk of derailment if a commuter train would strike any object upon the track . . . in the push mode as opposed to in the pull mode. It was further known to defendants . . . that the increased likelihood of derailment at high speed was occasioned by the fact that in the push mode there was inadequate weight at the front of the train in order to move objects off the track when contact with the commuter train was made."

In briefs filed in this court, plaintiffs further assert Metrolink was negligent (a) in failing to prohibit passenger seating in a cab car when it is in the lead; (b) in failing to use a cabbage car in the lead (a cabbage car is an older locomotive that has had its engine removed but continues in use, usually for

---

[1] The driver of the SUV is currently on trial in Los Angeles on numerous criminal charges, including 11 counts of murder.

baggage, with ballast to replace the weight of the engine); and (c) in failing to use some form of track surveillance or a scout vehicle.

We do not address the application of federal preemption principles to the other theories of liability asserted by plaintiffs' in the SAMA. (See Discussion, pt. 2.d., p. 739, *post.*)

### 3. *The pretrial ruling is certified to this court.*

At a hearing on a pretrial motion to determine whether federal regulations preempted plaintiffs' claim of negligence in Metrolink's use of push mode, the trial court observed plaintiffs could not allege negligence per se inasmuch as federal regulations expressly permit such operation. However, in a written order issued June 1, 2007, the trial court concluded plaintiffs' claim was not preempted to the extent it involved the "time, place and manner" of Metrolink's push mode operation. The trial court certified the issue pursuant to Code of Civil Procedure section 166.1.[2] Metrolink thereafter filed the instant writ petition seeking a determination plaintiffs' claim of negligence in the use of push mode operation was preempted by federal regulations.

### 4. *Proceedings in this court.*

We issued an order to show cause. In order to resolve Metrolink's claim of preemption, we first review the history of federal regulation of passenger rail service, then apply the preemption provision enacted as part of the Federal Railroad Safety Act of 1970, title 49 United States Code section 20106(a)(2), which, as relevant to this case, provides: "A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation . . . prescribes a regulation or issues an order covering the subject matter of the State requirement." (49 U.S.C. § 20106(a)(2).) Here, the "State requirement" is the application of state or local common law negligence principles to Metrolink's use of push mode operation.

*CSX Transp., Inc. v. Easterwood* (1993) 507 U.S. 658 [123 L.Ed.2d 387, 113 S.Ct. 1732] (*Easterwood*), the seminal and controlling decision in the area of Federal Railroad Safety Act preemption, construed this provision and held that, in order for a federal regulation to "cover" the same subject matter as a state law, it must do more than merely " 'touch upon' or 'relate to' that

---

[2] Code of Civil Procedure section 166.1 provides, in part: "Upon the written request of any party or his or her counsel, or at the judge's discretion, a judge may indicate in any interlocutory order a belief that there is a controlling question of law as to which there are substantial grounds for difference of opinion, appellate resolution of which may materially advance the conclusion of the litigation."

subject matter." (*Id.* at p. 664.) Rather, "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." (*Ibid.*)

The regulations in place at the time of the Glendale, California incident were promulgated by the Federal Railroad Administration (FRA) in 1999 pursuant to a Congressional mandate after five years of consideration of proposed rules and comments thereon from members of the rail industry and other interested parties. The final Passenger Equipment Safety Standards not only address the construction of passenger cars, including cab cars, but also contemplate the use of an occupied cab car in the lead position of a Tier I commuter train, i.e., a commuter train traveling at speeds below 125 miles per hour.[3]

We conclude these regulations substantially subsume plaintiffs' allegations of negligence to the extent they are based on Metrolink's operation of commuter trains in push mode. Thus, plaintiffs may not, through application of common law negligence principles, impose additional or different requirements. We therefore grant the writ petition and issue a peremptory writ of mandate directing the trial court to vacate the order of June 1, 2007, and to conduct further proceedings in accordance with the views expressed in this opinion.

## FACTS AND PROCEDURAL BACKGROUND

In this section of the opinion, we provide background information necessary to place the relevant federal regulations and the trial court's ruling in their proper context. We start with a brief history of push mode operation. We then proceed chronologically to examine the Congressional mandate pursuant to which the regulations were promulgated, review developments in the area of railroad safety that have had an impact on the formulation of the regulations, and review the regulations themselves. We then study the trial court's order in detail and note developments subsequent to the trial court's ruling.

1. *Historical perspective.*

The concept of pushing a train, as opposed to pulling, is as old as the railroad industry itself. Pushing permits a return trip without wyeing or otherwise turning the train, resulting in a significant increase in economies of

---

[3] Tier I trains operate at speeds not exceeding 125 mph; Tier II trains operate at speeds exceeding 125 mph but not exceeding 150 mph. (49 C.F.R. § 238.5 (2007).) Additional speed restrictions are imposed according to track classification in 49 Code of Federal Regulations part 213.9 (2007).

operation and reduced equipment requirements. When a train was pushed during the steam era, bell signals were used to relay information from the front of the train to the operator of the locomotive at the rear. The problem of delay in the actuation of the controls prevented the use of push mode in commuter trains until the introduction of electric cars in 1905. In that year, the Long Island Railroad introduced electrically powered multiple-unit (MU) passenger cars into high density commuter service.[4] In the next few years, MU passenger service expanded rapidly. Cab cars were introduced in the late 1950's.

At the present time, long-haul passenger service in this country primarily is provided by conventional locomotive-led trains. However, essentially all commuter train service in the United States is provided by push-pull or MU operations.

### 2. *Congress orders regulation of railroad safety.*

#### a. *The Federal Railroad Safety Act of 1970.*

In 1970, Congress enacted the Federal Railroad Safety Act of 1970 (FRSA), title 49 United States Code section 20101 et seq., "to promote safety in every area of railroad operations and reduce railroad-related accidents and incidents." (49 U.S.C. § 20101.) The FRSA gives the United States Secretary of Transportation (Secretary) broad power to "prescribe and issue orders for every area of railroad safety . . . ." (See 49 U.S.C. § 20133(a).) This power is exercised through the FRA.

#### b. *The Federal Railroad Safety Authorization Acts of 1980 and 1982.*

Congress separately addressed passenger safety with the enactment of the Federal Railroad Safety Authorization Act of 1980, which added to title 45 United States Code former section 431 a new subsection (h)(1), which provided: "The Secretary shall, within two years after the date of enactment of this subsection, issue such initial rules, regulations, orders, and standards as may be necessary to insure the safe construction, maintenance, and operation of railroad passenger equipment. The Secretary shall periodically review such rules, regulations, orders, and standards . . . ." (45 U.S.C., former § 431(h)(1), Pub.L. No. 96-423 (Oct. 10, 1980) 94 Stat. 1817.)

---

[4] MU passenger cars are self-propelled electric or diesel locomotive trains that typically operate semipermanently coupled together as a pair or triplet with a control cab at each end. MU locomotive service is very similar to push-pull service operated in the push mode with the cab car in the lead.

A new subsection (h)(3) to title 45 United States Code former section 431 provided that, in issuing initial rules, regulations, orders and standards, the Secretary may consult with the National Railroad Passenger Corporation (Amtrak), public authorities that operate passenger service, other rail carriers that transport passengers, organizations of passengers, and organizations of employees. (45 U.S.C. former § 431(h)(3).)

The Federal Railroad Safety Authorization Act of 1982 amended title 45 United States Code former section 431(h) to require the issuance of rules, regulations, orders and standards within one year of the enactment of the 1982 act and directed the Secretary to report to Congress thereon, explaining the reasons for the rules enacted. (45 U.S.C. former § 431(h)(1)(B), Pub.L. No. 97-468 (Jan. 14, 1983) 96 Stat. 2579.)

### c. *The Federal Railroad Safety Authorization Act of 1994.*

In 1994, these provisions were substantially rewritten and codified at title 49 United States Code section 20133 by the Federal Railroad Safety Authorization Act of 1994 (49 U.S.C. § 20101 et seq.; the 1994 Act) to provide: "Passenger cars [¶] (a) Minimum standards.—The Secretary of Transportation shall prescribe regulations establishing minimum standards for the safety of cars used by railroad carriers to transport passengers. Before prescribing such regulations, the Secretary shall consider—

"(1) the crashworthiness of the cars;

"(2) interior features (including luggage restraints, seat belts, and exposed surfaces) that may affect passenger safety;

"(3) maintenance and inspection of the cars;

"(4) emergency response procedures and equipment; and

"(5) any operating rules and conditions that directly affect safety not otherwise governed by regulations."

Title 49 United States Code section 20133(b) required the Secretary to prescribe initial regulations within three years after November 2, 1994, and final regulations within five years after November 2, 1994. (Added by Pub.L. No. 103-272 (July 5, 1994) 108 Stat. 873.)

### 3. *Emergency Order No. 20.*

FRA issued Emergency Order No. 20 (EO 20) on February 22, 1996 (61 Fed.Reg. 6876, amended on Mar. 5, 1996, 61 Fed.Reg. 8703), after two train

derailments on the East Coast, each of which involved a train being operated in push mode with a cab car in the lead position.[5] EO 20 noted that, "Of particular concern are those operations that involve carrying passengers in the lead car of a train over segments of track that do not have either cab signal systems . . . or automatic train stop or automatic train control systems . . . . Both of the recent accidents involved such operations." (61 Fed.Reg. 6876 (Feb. 22, 1996).)

EO 20 required commuter and intercity passenger railroads to "take certain immediate steps with regard to any of their operations above 30 miles per hour that do not entail cab signal, automatic train stop, or automatic train control protections and that permit passengers to occupy the leading car" of a train. (61 Fed.Reg. 6876, 6877 (Feb. 22, 1996).) These railroads were required to adopt operating rules which addressed how the crew reacted to wayside signals. These railroads also were required to "submit to FRA an interim system safety plan for enhancing the safety of such operations that includes (i) a description of circumstances in which the leading car is permitted to be occupied by passengers; (ii) a review of operating rules relevant to such operations; (iii) plans for any short-term technology enhancements that would enhance train control; (iv) a review of crew management practices to see what steps can be taken to improve crew alertness; (v) a review of the hazards posed to passengers in the forward car by vehicles using highway-rail grade crossings; and (vi) a review of practices, in addition to marking exits, used by the railroad to inform passengers of the location and operation of emergency exits, specifying any plans for enhancing such information." (*Ibid.*)

---

[5] On February 16, 1996, a collision occurred between Maryland Rail Commuter Service (MARC) train 286 and Amtrak train 29 at Silver Spring, Maryland. The MARC train was operating with a cab car in the lead of the train, followed by two passenger coaches and a locomotive. The collision separated the left front corner of the cab car from the roof to its sill plate, and tore off much of the forward left side of the car body. Fire erupted after the fuel tank of one of the Amtrak locomotives was breached. Fuel oil spilled into the MARC train's cab car through the openings in the torn car body. The forward section of the cab car was incinerated. Three crewmembers and eight passengers were fatally injured, and 13 other occupants of the MARC train sustained injuries.

On February 9, 1996, a collision occurred between New Jersey Transit Rail Operations, Inc., trains 1254 and 1107 on the border of Secaucus and Jersey City, New Jersey. Two crewmembers and one passenger were fatally injured, and 35 other people sustained injuries. The passenger fatality and most of the nonfatal injuries to passengers occurred on train 1254, which was operating with the cab car forward.

FRA noted that it would review the plans submitted and, based on that review, it would "determine whether other mandatory action appears necessary to address hazards associated with the subject rail passenger service." (61 Fed.Reg. 6876, 6882 (Feb. 22, 1996).)[6]

### 4. *The Advance Notice of Proposed Rulemaking.*

In order to comply with the 1994 Act, on June 17, 1996, FRA published an Advance Notice of Proposed Rulemaking (ANPRM) announcing the "initiation of rulemaking on rail passenger equipment safety standards." (61 Fed.Reg. 30672 (June 17, 1996).) The ANPRM indicated FRA had "established a Passenger Equipment Safety Standards Working Group (Working Group) comprised of representatives of the types of organizations listed in the Act to provide the consultation allowed by the Act." (61 Fed.Reg. 30672 (June 17, 1996).)

The ANPRM noted the "breadth" of the specific items listed in the 1994 Act and indicated, "FRA intends to establish a reasonably comprehensive structure of necessary safety regulations for rail passenger service in initial standards. Where further research is needed to develop a technical foundation for safety improvements, rulemaking may be completed over the 5-year period referred to in the [1994] Act." (61 Fed.Reg. 30672, 30673 (June 17, 1996).)

The ANPRM noted that "Federal safety standards for freight equipment have long been in place . . ." and "existing locomotive safety regulations address the structural characteristics of multiple-unit powered cars . . . ." (61 Fed.Reg. 30672, 30673 (June 17, 1996).) However, "effective . . . , but equivalent standards for passenger equipment do not currently exist. The Association of American Railroads (AAR) sets industry standards for the design and maintenance of freight equipment . . . . However, over the years AAR has discontinued the development and maintenance of passenger equipment standards." (61 Fed.Reg. 30672 (June 17, 1996).)

The ANPRM observed that current regulations permitted railcars of essentially uniform longitudinal strength. (61 Fed.Reg. 30672, 30687 (June 17, 1996).) However, the concept of crash energy management (CEM) would permit unoccupied or lightly occupied sections of the passenger car to be intentionally designed to be weaker than heavily occupied spaces. During a collision, the unoccupied spaces will deform before the occupied spaces,

---

[6] We note Metrolink's compliance with EO 20 is not in issue in this writ proceeding. However, one of the allegations of plaintiffs' SAMA asserts Metrolink failed to comply with EO 20. (See Discussion, pt. 2.d. at p. 739, *post.*)

minimizing the uncontrolled deformation of occupied space. (61 Fed.Reg. 30672, 30687 (June 17, 1996).)

The ANPRM proposed *"Tiered Equipment Design Standards Based on Risk Analysis."* (61 Fed.Reg. 30672, 30690 (June 17, 1996).) With respect to design standards for Tier I equipment, the ANPRM noted, "Current passenger equipment has certainly demonstrated its ability to operate safely at speeds up to 125 mph. However, the design of this equipment is largely based on loose industry standards that are no longer actively maintained or enforced. The design of new Tier I passenger equipment should not be left to a collection of similarly loose standards." (61 Fed.Reg. 30672, 30695 (June 17, 1996).)

The ANPRM observed that computer modeling had shown "the conventional uniform longitudinal structural strength design approach to be as effective as a crash energy management design approach in providing protection for passengers and crew at speeds up to approximately 70 mph." (61 Fed.Reg. 30672, 30695 (June 17, 1996).) However, the ANPRM proposed CEM design be required for all Tier II operations.

### 5. *The 1997 Notice of Proposed Rulemaking.*

Pursuant to the mandate of title 49 United States Code section 20133, on September 23, 1997, FRA published a Notice of Proposed Rulemaking (the 1997 NPRM), 62 Fed.Reg. 49728-01 (Sept. 23, 1997), which proposed a comprehensive set of safety regulations for railroad passenger equipment.

FRA noted the American Public Transportation Association (APTA) had submitted for FRA's review APTA's " 'Manual for the Development of a System Safety Plan for Commuter Railroads' (APTA Manual) . . . to assist commuter railroads in adopting a comprehensive system safety plan by September 1, 1997." (62 Fed.Reg. 49728, 49733 (Sept. 23, 1987).) The 1997 NPRM noted, "The proposed rule contains system safety requirements to be applied to all intercity passenger and commuter rail equipment. . . . Each individual railroad would be required to develop a system safety plan and a system safety program tailored to its specific operation, including train speed. . . . [¶] Through the system safety process, each railroad would be required to identify, evaluate, and seek to eliminate or reduce the hazards associated with the use of passenger equipment over the railroad system." (*Ibid.*)

"However, because FRA is also proposing a comprehensive set of mandatory, equipment safety standards in this rule, FRA is generally not proposing to enforce every element of a railroad's system safety plan." (62 Fed.Reg.

49728, 49733 (Sept. 23, 1997).) The 1997 NPRM noted FRA would "carefully consider the comments received in deciding what approach to take in the final rule with respect to system safety plans." (62 Fed.Reg. 49728, 49734 (Sept. 23, 1997).)

> 6. *The 1999 Final Rule; Passenger Equipment Safety Standards.*

> a. *In general.*

On May 12, 1999, FRA issued its final rule promulgating the Passenger Equipment Safety Standards. The regulations contain "comprehensive Federal safety standards for railroad passenger equipment." (64 Fed.Reg. 25540 (May 12, 1999).) The stated purpose of these regulations is "to prevent collisions, derailments, and other occurrences involving railroad passenger equipment . . . and to mitigate the consequences of any such occurrences, to the extent they cannot be prevented." (64 Fed.Reg. 25540 (May 12, 1999).)

The final rule noted "the railroad operating environment in the United States requires passenger equipment to operate commingled with very heavy and long freight trains, often over track with frequent grade crossings used by heavy highway equipment." (64 Fed.Reg. 25540 (May 12, 1999).) The final rule expressed concern that passenger equipment designed to European and other international standards might not be capable of withstanding the hazards such equipment faced when operated in this country. Thus, "[a] clear set of Federal safety standards for railroad passenger equipment is needed that is tailored to the nation's operating environment in order to provide for the safety of rail operations in the United States and to facilitate sound planning for these operations." (64 Fed.Reg. 25540, 25541 (May 12, 1999).)

> b. *The federal regulations related to Tier I passenger service in place at the time of the Glendale incident.*

Pursuant to regulations promulgated by the final rule, both currently and at the time of the Glendale incident, all Tier I passenger equipment must satisfy numerous structural strength and design requirements including standards for static end strength (49 C.F.R. § 238.203 (2007)), anticlimbing mechanisms (49 C.F.R. § 238.205 (2007)), collision posts (49 C.F.R. § 238.211 (2007)) and corner posts (49 C.F.R. § 238.213 (2007)). However, the regulations require that collision posts in a cab car or an MU locomotive be capable of resisting significantly greater force than collision posts in a passenger car.

Specifically, 49 Code of Federal Regulations part 238.211(a) (2007), requires all passenger equipment placed in service after September 8, 2000, to have two full-height collision posts at each end, each of which shall have

ultimate longitudinal shear strength of not less than 300,000 pounds at a point even with the top of the underframe member to which it is attached. Part 238.211(b) provides, "Each locomotive, including a cab car and an MU locomotive, . . . placed in service . . . after September 9, 2002, shall have at its forward end, in lieu of the structural protection described in paragraph (a) of this section, either: [¶] (1) Two forward collision posts, . . . each capable of withstanding: [¶] (i) A 500,000-pound longitudinal force at the point even with the top of the underframe, without exceeding the ultimate strength of the joint; and [¶] (ii) A 200,000-pound longitudinal force exerted 30 inches above the joint of the post to the underframe, without exceeding the ultimate strength; or [¶] (2) An equivalent end structure that can withstand the sum of the forces that each collision post in paragraph (b)(1)(i) of this section is required to withstand." (49 C.F.R. § 238.211(b) (2007).)

Additionally, the regulations permit passenger seating in a cab car when it is in the lead of a Tier I train but prohibit passenger seating in the lead car of Tier II passenger trains. (49 C.F.R. § 238.403(f) (2007).)

 c. *Crash energy management design and mandatory system safety plans applicable only to Tier II passenger service.*

The final rule required that Tier II passenger equipment be "designed with a crash energy management system to dissipate kinetic energy during a collision." (64 Fed.Reg. 25540, 25630 (May 12, 1999); 49 C.F.R. § 238.403(a) (2007).) Crash energy management design was not required for Tier I passenger service.

With respect to system safety, the 1999 final rule indicated the working group had agreed on system safety program requirements for Tier II equipment but did not reach consensus on system safety requirements for Tier I equipment. FRA noted it had issued final regulations governing emergency preparedness plans for railroads operating passenger trains in May of 1998. (See 63 Fed.Reg. 24630 (May 4, 1998).) FRA indicated it expected "Tier I railroad operations will be able to integrate the specific safety planning requirements contained in this final rule into their own system safety plans, in the same way the railroads will incorporate into their plans the emergency planning requirements contained in title 49 CFR part 239." (64 Fed.Reg. 25540, 25550 (May 12, 1999).)

"FRA is retaining more extensive safety planning requirements for Tier II railroad operations. . . . Tier II railroad operations will be operations with new characteristics that require special attention and have heightened safety risks due to the speed of the equipment. In particular, each railroad must [have a] safety program plan for the operation of its Tier II passenger

equipment prior to placing the equipment into revenue service." (64 Fed.Reg. 25540, 25550 (May 12, 1999).)

In general, however, the final rule does not require that FRA approve a railroad's system safety plan. FRA indicated its belief that "FRA approval may not be necessary when, by operation of the rule, each railroad must independently comply with specific safety planning requirements or face sanction from FRA." (64 Fed.Reg. 25540, 25550 (May 12, 1999).)

### 7. *The June 2006 report to Congress.*

As a result of the 2005 Glendale derailment incident, Congress asked FRA to study the safety of push-pull operations. In its June 2006 report to Congress, FRA examined accident data compiled over a 20-year period and found there was no statistically significant difference in the incidence of derailment between push versus pull operations. The report emphasized that abandonment or reduction of push-pull operations would impose substantial costs and burdens on passenger rail operators and would result in adverse consequences for commuters in that they would have to seek alternative, and probably less safe, forms of transportation, either because operators would run fewer trains or because restricting passenger use of cab cars would reduce available seating and would result in more "standees" during peak hours of use. "Standees are generally more at risk of sustaining an injury during an accident or incident than are seated passengers."

The June 2006 report to Congress states: "FRA is aware that concerns arising in relation to push-pull service could in theory be addressed by strategies such as turning trains; operating with cabbage cars in the lead using de-powered locomotives; or operating with the cab cars empty when in the lead. Needless to say, commuter railroads are permitted to employ these approaches as they may wish, consistent with the available resources. State and local agencies funding these services may direct that they do so. . . . [¶] . . . [¶] . . . This issue is best resolved on the merits of individual operating environments and in the context of safety system planning, including the conduct of a suitable collision hazard analysis."

### 8. *The trial court's ruling.*

At the hearing on plaintiffs' motion to determine the applicable law, the trial court asked plaintiffs' counsel to clarify the negligence claim. When counsel responded Metrolink "should be pulling and not pushing," the trial court observed it could not "restrict push-pull." Plaintiffs then argued the regulations lacked preemptive effect because they did not address the subject matter of push mode operation of a passenger train in a "highly dense commercial or residential area where they can expect multiple grade crossings."

Later in the hearing, the trial court noted plaintiffs were not claiming "that pushing per se is negligent because pushing per se has been allowed by the Federal Government. So you are really just talking about how it's operated in this particular situation."

Thereafter, in an order dated June 1, 2007, the trial court found plaintiffs' claim of negligence in the use of push mode was not preempted. The trial court ruled the express preemption provision of title 49 United States Code section 20106 did not bar plaintiffs' negligence claim because the "savings clause" permits states, even after a regulation or order has been issued, to "adopt more stringent safety requirements 'when necessary to eliminate or reduce an essentially local safety hazard.' " (See 49 U.S.C. § 20106(a)(2).)[7]

The trial court also relied on the portion of the June 2006 report to Congress which acknowledged that state and local agencies funding commuter railroads are permitted to turn trains, use cabbage cars or operate with cab cars empty when in the lead as they may wish. The report to Congress noted: "This issue is best resolved on the merits of individual operating environments and in the context of safety system planning, including the conduct of a suitable collision hazard analysis." The trial court reasoned this statement evinced an intent to leave the "time, place and manner" of push operations to the judgment of individual commuter train operators.

The trial court also found the Passenger Equipment Safety Standards issued by FRA with respect to anticlimbing mechanisms, collision posts and rollover strength addressed "construction features" and these regulations did "not suggest an intention by the FRA to ban all state regulation and common law claims concerning the when, where and how of push-pull operations." The trial court concluded plaintiffs' claims were not preempted. The issue of excessive speed was neither presented to nor addressed by the trial court.

---

[7] The trial court's reference to the "savings clause" of title 49 United States Code section 20106 relates to the second sentence of subsection (a)(2). The trial court's reliance on this provision was misplaced, as plaintiffs concede they do not rely on this "savings clause."

In full, 49 United States Code section 20106(a)(2) provides: "(2) A State may adopt or continue in force a law, regulation, or order related to railroad safety or security until the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), prescribes a regulation or issues an order covering the subject matter of the State requirement. A State may adopt or continue in force an additional or more stringent law, regulation, or order related to railroad safety or security when the law, regulation, or order—

"(A) is necessary to eliminate or reduce an essentially local safety or security hazard;

"(B) is not incompatible with a law, regulation, or order of the United States Government; and

"(C) does not unreasonably burden interstate commerce."

### 9. *The 2007 NPRM; FRA's stated belief its regulations preempt plaintiffs' push mode claims.*

As part of its continuing examination of regulations related to rail passenger service, on August 1, 2007, FRA published a Notice of Proposed Rule Making (the 2007 NPRM) which, inter alia, proposed extending CEM design to Tier I passenger trains. (72 Fed.Reg. 42016 (Aug. 1, 2007).) Metrolink asked this court to take judicial notice of the 2007 NPRM.[8] Metrolink's intent in requesting judicial notice was to place before this court FRA's belief, expressed in the 2007 NPRM, that it "has comprehensively and intentionally covered the subject matter of the requirements for passenger equipment, planning for the safe use of passenger equipment, and the manner in which passenger equipment is used. In so doing, FRA believes that it has preempted any State law, regulation, or order, including State common law, concerning the operation of a cab car or MU locomotive as the leading unit of a passenger train. This [2007] NPRM on cab car and MU locomotive crashworthiness further refines FRA's comprehensive regulation of passenger equipment safety and serves to show that the operation of cab cars and MU locomotives is a matter regulated by FRA, and not one which FRA has left subject to State statutory, regulatory, or common law standards covering that subject matter." (72 Fed.Reg. 42016, 42028 (Aug. 1, 2007).)

The 2007 NPRM noted: "FRA's ultimate regulatory decision in issuing a final rule on passenger equipment and safety standards was to address only certain aspects of system safety planning, focused primarily on rail passenger equipment, rather than to require generally that the railroads implement comprehensive system safety plans. [Citation.] While FRA acknowledged that the plans required by the regulation would be part of larger system safety planning efforts, only the elements specifically addressed in the rule would be enforced. As with most of FRA's regulations, the final rule prescribed minimum Federal safety standards and did not restrict a railroad and other persons subject to the regulation from adopting additional or more stringent requirements not inconsistent with the final rule. [Citation.] [¶] FRA made a conscious decision to regulate in a way that allowed greater flexibility in overall system safety planning for Tier I passenger equipment, stating in the final rule that: [¶] FRA will closely monitor Tier I railroad operations in their development and adherence to voluntary, comprehensive system safety plans.

---

[8] On August 22, 2007, we granted Metrolink's request to take judicial notice of the 2007 NPRM. Evidence Code section 451 mandates judicial notice of "[a]ny matter made a subject of judicial notice by . . . Section 1507 of Title 44 of the United States Code." (Evid. Code, § 451, subd. (b).) That federal statute provides that "[t]he contents of the Federal Register shall be judicially noticed . . . ." (44 U.S.C. § 1507; see *Black v. Financial Freedom Senior Funding Corp.* (2001) 92 Cal.App.4th 917, 934, fn. 13 [112 Cal.Rptr.2d 445].) In addition to taking judicial notice of the 2007 NPRM, we have drawn liberally from the Federal Register in preparing the background material that appears in this opinion.

FRA has already established a liaison relationship with APTA and has already begun participating in system safety plan audits on commuter railroads. FRA is using this involvement to enrich FRA's Safety Assurance and Compliance Program (SACP) efforts on these railroads—which unlike the triennial audit process for system safety plans, is a continuous activity with frequent on-property involvement by FRA safety professionals. FRA will reconsider its decision not to impose a general requirement for system safety plans on Tier I railroad operations if the need to do so arises. [Citation.]" (72 Fed.Reg. 42016, 42029–42030 (Aug. 1, 2007).)

The 2007 NPRM further notes, "FRA considered the proper scope of systems safety planning requirements that it should impose for [Tier I passenger] operations, and chose not to impose general system safety requirements for this equipment. Instead, in the 1999 final rule FRA imposed a myriad of substantive requirements intended to ensure the safety of the equipment in whatever operational mode it is used." (72 Fed.Reg. 42016, 42030 (Aug. 1, 2007).)

The 2007 NPRM explains: "FRA's decision to require more general system safety planning for Tier II passenger operations, and to impose substantive requirements that in both effect and application prohibit passenger seating in the leading unit of Tier II passenger trains, make clear that these issues were carefully considered in the 1999 final rule. Of course, by virtue of imposing stricter standards on Tier II passenger equipment than Tier I passenger equipment, FRA did not intend States to step in and regulate Tier I passenger equipment. On the contrary, FRA recognized the operational differences between Tier I and Tier II passenger equipment, and purposely chose to address these two types of equipment differently. Where FRA has prohibited one thing and chosen not to prohibit another, such as prohibiting cab car-forward operations for Tier II and not for Tier I, FRA intended to allow a railroad to do that which FRA did not prohibit. FRA's regulatory choice was intended to be preemptive of State standards with regard to both Tier I and Tier II passenger equipment." (72 Fed.Reg. 42016, 42030 (Aug. 1, 2007).)

"[W]here FRA has required passenger railroads to engage in system safety planning or has not required such planning because the passenger railroads, in FRA's judgment, are doing an adequate job of system safety planning, FRA intends to preempt State and local regulation precisely because FRA has already decided what system safety planning each railroad should be doing based on its own circumstances. The relevant circumstances vary more widely among passenger railroads than among freight railroads and, at this level of specificity, the best and most effective planning is aimed squarely at the circumstances of each individual passenger railroad. Therefore, State or

local regulation of such system safety planning is also preempted." (72 Fed.Reg. 42016, 42031 (Aug. 1, 2007).)

## ISSUES ADDRESSED IN THIS WRIT PROCEEDING

We issued an order to show cause why the relief requested in Metrolink's writ petition should or should not be granted. We note the trial court was not presented with, and did not consider, specific theories of liability. Instead, the trial court broadly authorized plaintiffs to pursue negligence claims based on the "time, place and manner" of Metrolink's push mode operation.

In this opinion, we address specific claims raised by plaintiffs but only those claims that arise exclusively when a train is operated in push mode. These issues include the claims of (1) negligence in the failure to use a cabbage car in the lead; (2) negligence in permitting passenger seating in a lead cab car; and (3) negligence in failing to use a scout vehicle or some form of track surveillance in conjunction with push mode to ensure the track is clear.

## DISCUSSION

1. *FRSA regulations preempt plaintiffs' push mode claims.*

 a. *Easterwood.*

A discussion of the decision of the United States Supreme Court in *Easterwood, supra,* 507 U.S. 658 must precede any analysis of the FRSA preemption provision.[9] In *Easterwood,* the plaintiff brought suit under Georgia law alleging the railroad was negligent because of the train's excessive speed and the railroad's failure to maintain proper warning signs at a crossing.

In terms of general preemption principles, *Easterwood* stated: "Where a state statute conflicts with, or frustrates, federal law, the former must give way. [Citations.] In the interest of avoiding unintended encroachment on the authority of the States, however, a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find pre-emption." (*Easterwood, supra,* 507 U.S. at pp. 663–664.) Thus, there is a "presumption against pre-emption." (*Id.* at p. 668.)

---

[9] At the time of the *Easterwood* decision, the language currently found at title 49 United States Code section 20106(a)(2) was found at title 45 United States Code section 434.

*Easterwood* noted that, when considering a federal statute involving a subject traditionally governed by state law, "pre-emption will not lie unless it is 'the clear and manifest purpose of Congress.' " (*Easterwood, supra,* 507 U.S. at p. 664.) *Easterwood* found the "plain wording" of the preemption clause "necessarily contains the best evidence of Congress' pre-emptive intent." (*Ibid.*) Construing the provision currently found at title 49 United States Code section 20106(a)(2), *Easterwood* held that in order for a federal regulation to "cover" the same subject matter as a state law, it must do more than merely " 'touch upon' or 'relate to' that subject matter." (*Easterwood, supra,* at p. 664.) Rather, "pre-emption will lie only if the federal regulations substantially subsume the subject matter of the relevant state law." (*Id.* at p. 664.)

Addressing the failure to warn claim, *Easterwood* found the applicable federal regulations on warning devices "displace[d]" state tort law under which the plaintiffs sought to impose "an independent duty on a railroad to identify and/or repair dangerous crossings." (*Easterwood, supra,* 507 U.S. at pp. 670, 671; see *Norfolk Southern R. Co. v. Shanklin* (2000) 529 U.S. 344, 356–357 [146 L.Ed.2d 374, 120 S.Ct. 1467] [regulations addressing installation of crossing warning devices do not merely establish minimum protections].) However, federally funded warning devices had not been installed at the crossing where the accident occurred. (*Easterwood, supra,* at pp. 671–673.) Thus, the failure to warn issue was not preempted.

Regarding the excessive speed claim, *Easterwood* held FRA regulations that established maximum train speeds preempted a state common law claim the train should have slowed at a grade crossing. *Easterwood* explained that, rather than calling for reduced speeds at grade crossings, the FRSA regulations chose to focus on "providing clear and accurate warnings of the approach of oncoming trains to drivers." (*Easterwood, supra,* 507 U.S. at p. 674.) "On their face, the provisions of [49 Code of Federal Regulations] § 213.9(a) address only the maximum speeds at which trains are permitted to travel given the nature of the track on which they operate. Nevertheless, related safety regulations adopted by the Secretary reveal that the limits were adopted only after the hazards posed by track conditions were taken into account. Understood in the context of the overall structure of the regulations, the speed limits must be read as not only establishing a ceiling, but also as precluding additional state regulation [of train speed]." (*Id.* at p. 674.) Thus, the federal speed regulation substantially subsumed and preempted the relevant state law as to claims based on train speed. (*Id.* at pp. 675–676.)

*Easterwood* noted it did not address, and the railroad was prepared to concede, that preemption of the plaintiff's excessive speed claim did not bar suit for breach of the duty to slow or stop a train to avoid a specific,

individual hazard. However, the allegation in the plaintiff's complaint that the train "was traveling too quickly given the 'time and place' " was preempted. (*Easterwood, supra,* 507 U.S. at p. 676, fn. 15.)

### b. *Application here.*

Applying *Easterwood*'s analysis to plaintiffs' claim of negligence in the use of push mode operation in the pending case, it is apparent that FRA promulgated the 1999 final rule addressing the construction of passenger cars, including cab cars, only after an extensive, legislatively mandated consideration of proposed rules and comments thereon by rail service providers and other interested parties. This process was commenced in order to fulfill the Congressional directive to enact regulations addressing passenger rail safety.

Plaintiffs argued, and the trial court agreed, that FRA regulations address railcar construction and design, not railcar operations. However, the regulations address not only the construction of passenger cars, including cab cars, but also contemplate the use of an occupied cab car in the lead position of a Tier I commuter train if the cab car satisfies the increased strength requirements for collision posts.

These regulations take into account the operating environment in which rail passenger service occurs. As indicated in the Passenger Equipment Safety Standards, "the railroad operating environment in the United States requires passenger equipment to operate commingled with very heavy and long freight trains, often over track with frequent grade crossings used by heavy highway equipment." (64 Fed.Reg. 25540 (Apr. 26, 1999).) Thus, FRA's regulations are "tailored to the nation's operating environment in order to provide for the safety of rail operations in the United States." (64 Fed.Reg. 25540, 25541 (Apr. 26, 1999).) FRA's regulation of push-pull service thus accounts for the operational and safety concerns presented by passenger rail operations in urban areas.

Consequently, the regulations address not only the design, but also the use of the cab car in the forward position of a Tier I commuter train.

Plaintiffs' common law negligence claims that Metrolink should have used a cabbage car or an unoccupied cab car in the lead, or, if it operated in push mode, it was required to use a scout vehicle or track surveillance, address the very same safety concerns addressed by FRA's regulations, namely, the safe operation of push-pull commuter trains. Indeed, the regulations expressly state they are intended to prevent or mitigate "collisions, derailments, and other occurrences involving railroad passenger equipment that cause injury or death to railroad employees, railroad passengers, or the general public; and to

mitigate the consequences of such occurrences to the extent they cannot be prevented." (49 C.F.R. § 238.1(a) (2007).)

Moreover, the absence of federally regulated system safety plans for Tier I passenger operations does not reflect an intent not to regulate system safety of these operations. Rather, FRA decided to continue voluntary compliance with system safety plans with audits by APTA and to focus on the greater need for system safety planning in Tier II operations. FRA's flexible approach to the regulation of Tier I system safety planning does not suggest FRA intended to leave regulation of these matters to local authorities.

■ It therefore appears federal regulations have preempted plaintiffs' claims of common law negligence in the use of push mode operation.

 c. *FRA's statement of its intent to preempt local laws in the 2007 NPRM.*

As noted above, FRA stated its belief in the 2007 NPRM that it "has preempted any State law, regulation, or order, including State common law, concerning the operation of a cab car or MU locomotive as the leading unit of a passenger train." (72 Fed.Reg. 42016, 42028 (Aug. 1, 2007).)

Plaintiffs object to this court's consideration of this aspect of the 2007 NPRM. They assert the 2007 NPRM is not binding until the public has been given an opportunity to comment and the agency publishes the proposed rules in final form. Plaintiffs argue the 2007 NPRM has no legal effect on their claims and it cannot be applied retroactively to this case. (See *Health Ins. Ass'n of America, Inc. v. Shalala* (D.C. Cir. 1994) 306 U.S. App.D.C. 104 [23 F.3d 412, 423].) Plaintiffs claim even final statements of policy similar to the one found in the 2007 NPRM have been rejected as unreliable and contrary to *Easterwood* preemption principles. (*Tyrrell v. Norfolk Southern Ry. Co.* (6th Cir. 2001) 248 F.3d 517, 524–525, citing *Southern Pacific Transp. v. Public Utilities Com'n* (N.D.Cal. 1986) 647 F.Supp. 1220, 1224–1227, affd. (9th Cir. 1987) 820 F.2d 1111.) Plaintiffs further claim the preemption statement in the 2007 NPRM appears to be little more than a litigating position taken with the specific intent to undermine plaintiffs' claims in this case. (*Health Ins. Ass'n of America, Inc. v. Shalala, supra,* at p. 424.)

■ We agree FRA's preemption comments in the 2007 NPRM must be scrutinized before they can be accepted. As noted in *Atchison, Topeka and Santa Fe Ry. Co. v. Peña* (7th Cir. 1994) 44 F.3d 437, 442, " 'The weight given to an agency interpretation depends on many factors, including the

validity of its reasoning, its consistency with earlier and later agency pronouncements and whether the administrative document was issued contemporaneously with the passage of the statute being interpreted.' [Citation.] In short, we look to 'the thoroughness, validity, and consistency of the agency's reasoning.' [Citation.]"

Here, the historical context that resulted in the promulgation of the Passenger Equipment Safety Standards supports FRA's statement of its intention to preempt state regulation of push mode operation of passenger trains with an occupied cab car in the lead. Consequently, although not necessary to our analysis of whether plaintiffs' push mode claims are preempted, FRA's interpretation of the preemptive effect of its regulations is consistent with our conclusion.

 d. *Absence of a specific rule addressing push-pull operation not determinative.*

Plaintiffs argue there is no rule, regulation or order that actually addresses push-pull operations and FRA's silence on the matter is insufficient to warrant the conclusion the field has been preempted. Plaintiffs further argue FRA regulations do not prohibit push mode for Tier II passenger trains. Rather, the regulations prohibit passenger seating in the lead car of a Tier II passenger train. (49 C.F.R. § 238.403(f) (2007).)

Plaintiffs note common carriers owe their passengers the highest duty of care. (*Gomez v. Superior Court* (2005) 35 Cal.4th 1125, 1128–1130 [29 Cal.Rptr.3d 352, 113 P.3d 41].) Thus, " 'FRSA preemption is even more disfavored than preemption generally.' " (*United Transp. Union v. Foster* (5th Cir. 2000) 205 F.3d 851, 860.) Plaintiffs assert Metrolink's burden of establishing preemption is especially heavy where, as here, preemption would displace the power of the states to provide for the health and safety of their citizens. (*Medtronic, Inc. v. Lohr* (1996) 518 U.S. 470, 485 [135 L.Ed.2d 700, 116 S.Ct. 2240].) Plaintiffs conclude this court should not presume preemption from a patchwork of regulations that do not address push-pull as an operational mode.

 Plaintiffs argument in this regard fails to take into account the teaching of *Easterwood* that FRA regulations do not preempt only state laws which impair or are inconsistent with the regulations. Rather, *Easterwood* found state law claims of negligence were preempted based on a "series of related regulations and overall structure of the regulations, although no regulation directly addressed the state requirement . . . ." (*Burlington Northern and Santa Fe Ry. Co. v. Doyle* (7th Cir. 1999) 186 F.3d 790, 796.)

Subsequent cases have recognized that federal regulations need not "impose bureaucratic micromanagement in order to substantially subsume a particular subject matter." (*In re Derailment Cases* (8th Cir. 2005) 416 F.3d 787, 794 [rejecting a claim that negligent inspection claims were not preempted because the federal regulations did not specify the manner in which freight car inspections must be accomplished].)

 Thus, the absence of a specific regulation on push pull is only one factor to be considered in determining whether the matter has been substantially subsumed. Where, as here, Congress directs FRA to issue rules and regulations addressing passenger safety and, in response to the Congressional mandate, FRA conducts extensive regulatory proceedings and thereafter promulgates regulations related to the operation of a cab car in push mode, the absence of a specific regulation addressing push mode operation is of no consequence.

We therefore conclude *Easterwood* compels the conclusion plaintiffs' common law theories of negligence that would impose additional or different requirements on Metrolink's push mode operations have been substantially subsumed by the federal regulations and thus are expressly preempted under title 49 United States Code section 20106(a)(2).

### 2. *Plaintiffs' remaining arguments to the contrary are not persuasive.*

Plaintiffs object to the conclusion reached above on several bases. They argue (a) the issue presented is one of train configuration which was resolved in their favor in *Union Pacific R. Co. v. California Public Utilities* (9th Cir. 2003) 346 F.3d 851 (*Union Pacific*); (b) a recent amendment of title 49 United States Code section 20106 shows their claims are not preempted; (c) the June 2006 report to Congress reveals that FRA has left regulation of the operation of push-pull trains in the hands of local authorities; and, (d) a finding of preemption is disfavored because it would leave plaintiffs in this case without a remedy.

We address these claims in turn in the discussion sections that follow.

### a. Union Pacific, supra, *346 F.3d 851.*

Plaintiffs contend their state law negligence claims amount to an argument that Metrolink should have reconfigured its trains to reduce the risk of derailment. Plaintiffs assert the cabbage car theory, in particular, presents an issue of train configuration. Plaintiffs contend *Union Pacific, supra*, 346 F.3d 851, upheld the ability of the states to regulate train configuration. We do not find this argument persuasive.

In *Union Pacific*, the State of California sought to regulate freight train configuration, i.e., the order of the cars in a train, to reduce the risk of derailment on mountainous terrain. The State required railroads operating on certain tracks to reconfigure the cars to better distribute the weight of the train. The railroad claimed preemption relying on the FRSA and the Locomotive Boiler Inspection Act. In *Union Pacific*, FRA acknowledged there were no federal freight train makeup rules and FRA had determined its other regulations did not require freight railroads to comply with their own "track—train dynamics" rules. *Union Pacific* concluded that because FRA did not require federal approval of the train makeup rules, it had not substantially subsumed the subject so as to preclude state regulation, citing *Easterwood.*

Unlike the situation in *Union Pacific*, in this case FRA does not concede that no federal regulations address the operation of an occupied cab car in the lead position of a Tier I commuter train operated in push mode. Additionally, plaintiffs' cabbage car theory seeks to require Metrolink to use additional equipment, not merely to reconfigure the train. Thus, *Union Pacific* does not assist plaintiffs.

 b. *The 2007 amendment of title 49 United States Code section 20106 has no present application to this case.*

On August 8, 2007, Congress amended title 49 United States Code section 20106 by adding a new subdivision (b), entitled "Clarification regarding State law causes of action." The new subdivision (b)(1) provides state law claims based on the failure to comply with a standard of care established by a federal regulation are not preempted: "(A) [where a party] has failed to comply with the Federal standard of care established by [federal] regulation or order . . . ; [¶] (B) [where a party] has failed to comply with its own plan, rule, or standard that it created pursuant to a [federal] regulation . . . ; or [¶] (C) [where a party] has failed to comply with a State law, . . . that is not incompatible with subsection (a)(2)" of section 20106. (49 U.S.C. § 20106(b)(1).)[10] The new law applies to "all pending State law causes of

---

[10] Stated in full, title 49 United States Code section 20106(b)(1) provides:

"(b) Clarification regarding State law causes of action. [¶] (1) Nothing in this section shall be construed to preempt an action under State law seeking damages for personal injury, death, or property damage alleging that a party—

"(A) has failed to comply with the Federal standard of care established by a regulation or order issued by the Secretary of Transportation (with respect to railroad safety matters), or the Secretary of Homeland Security (with respect to railroad security matters), covering the subject matter as provided in subsection (a) of this section;

"(B) has failed to comply with its own plan, rule, or standard that it created pursuant to a regulation or order issued by either of the Secretaries; or

"(C) has failed to comply with a State law, regulation, or order that is not incompatible with subsection (a)(2)."

action arising from events or activities occurring on or after January 18, 2002." (49 U.S.C. § 20106(b)(2).)

Plaintiffs argue the amendment establishes Congress's intent that state common law causes of action are not preempted under the FRSA to the extent there is no "incompatible" regulation or order "covering" the subject matter of the common law claim. Plaintiffs claim Congress clearly pronounced that traditional principles of state negligence law should apply to the railroads unless they are expressly supplanted by federal rules, regulations or orders covering the same subject matter.

■ However, title 49 United States Code section 20106(b)(1)(C), on which plaintiffs rely, does not speak in terms of state claims being incompatible with federal regulations. Rather, it provides a state claim may proceed if it is based on state law that is "not incompatible with (a)(2)." In other words, in order for a state claim to proceed, it cannot be one that is preempted under title 49 United States Code section 20106(a)(2). Because plaintiffs' push mode claims are preempted, section 20106(b)(1)(C) does not apply.

This conclusion is supported by the legislative history of the amendment, which reveals Congress did not intend any substantive change in the meaning of title 49 United States Code section 20106. (H.R. Conf. Rep. No. 110-259, 1st Sess., p. 351 (2007).) Rather, the amendment was enacted in response to a series of federal court decisions which held that a finding of preemption not only barred claims that would impose other obligations on a railroad but also barred claims premised upon failure of a railroad to comply with the federal regulations that gave rise to the preemption. (See *Lundeen v. Canadian Pacific Ry. Co.* (8th Cir. 2006) 447 F.3d 606, 614–615; *Mehl v. Canadian Pacific Ry., Ltd.* (D.N.D. 2006) 417 F.Supp.2d 1104, 1119; *Kalan Enterprises, LLC v. BNSF Ry. Co.* (D.Minn. 2006) 415 F.Supp.2d 977, 980.) *Mehl* noted the inequity of the situation, echoing a sentiment previously expressed in dissent by Justice Ginsberg in *Norfolk Southern R. Co. v. Shanklin, supra,* 529 U.S. at pp. 360–361.

The House Conference Report states: "The Conference substitute adopts a provision that would clarify the intent and interpretations of the existing preemption statute and . . . rectify the Federal court decisions related to the Minot, North Dakota accident that are in conflict with precedent." (H.R. Conf. Rep. No. 110-259, 1st Sess., p. 351; see 120 Cong. Rec. H8589 (daily ed. July 25, 2007).) The report notes the section retains the "exact text" of title 49 of United States Code section 20106 as it existed prior to the amendment and "the restructuring is not intended to indicate any substantive change in the meaning of the provision." (H.R. Conf. Rep. No. 110-259, 1st Sess., p. 351 (2007).)

In light of this legislative history, it is difficult to read the amendment as permitting state claims as long as they are not incompatible with federal regulations. Such a reading would amount to a significant substantive change in the law of FRSA preemption and there is no indication Congress intended such a change.

Rather, the amendment was intended to allow claims based on a railroad's failure to comply with federal regulations or its own regulations. Because Metrolink's compliance with federal regulations or its own regulations is not in issue in this writ proceeding, title 49 United States Code section 20106(b) has no present application to this case.

 c. *The June 2006 report to Congress does not support plaintiffs' position.*

Plaintiffs argue the June 2006 report to Congress demonstrates FRA has empowered state and local agencies to address safety concerns in relation to push-pull operations. Plaintiffs rely on the same portion of the June 2006 report to Congress that the trial court cited in its written order, namely, the recognition that state and local agencies funding commuter railroads may turn trains, operate with cabbage cars in the lead or operate with the cab cars empty when in the lead "as they may wish, consistent with the available resources." "This issue is best resolved on the merits of individual operating environments and in the context of safety system planning, including the conduct of a suitable collision hazard analysis."

We believe plaintiffs read too much into the quoted passage. Indeed, even before the June 2006 report to Congress, the federal regulations on Passenger Equipment Safety Standards *"d[id] not restrict a railroad from adopting and enforcing additional or more stringent requirements not inconsistent with this part."* (49 C.F.R. § 238.1(b) (2007), italics added; 64 Fed.Reg. 25540, 25660, (May 12, 1999).) The report to Congress merely recognizes that a local funding agency operating a commuter rail system has discretion to do more than FRA regulations require. The ability of a state or local funding body to abandon or modify push mode operation of a commuter railroad does not suggest that a state or local court or jury has the power to determine whether push-pull operations are safe. Thus, nothing in this statement dissuades us from the conclusion plaintiffs' claim that Metrolink was negligent in using push mode operation in an urban setting has been preempted.

d. *A finding of preemption does not completely deprive plaintiffs of any remedy.*

Plaintiffs argue that where preemption of common law claims would leave injured individuals without any state or federal remedy, which is the result being sought by Metrolink, a court may find preemption only in the most compelling circumstances. (*English v. General Electric Co.* (1990) 496 U.S. 72, 87–90 [110 L.Ed.2d 65, 110 S.Ct. 2270]; *Silkwood v. Kerr-McGee Corp.* (1984) 464 U.S. 238, 251 [78 L.Ed.2d 443, 104 S.Ct. 615].)

However, a finding of preemption in this case does not completely deprive plaintiffs of any remedy. In addition to the claim of negligence based on push mode operation, the SAMA alleges (1) Metrolink failed to comply with EO 20; (2) Metrolink failed to comply with relevant federal regulations, including 49 Code of Federal Regulations part 229.123 (2007), which requires a lead locomotive to be equipped with "an end plate that extends across both rails"; (3) Metrolink was negligent in permitting objects and persons to be located on the train right-of-way; and, (4) Metrolink failed to comply with its own rules and regulations relating to push mode operation.

These claims remain extant. Consequently, there is no merit to the assertion that a finding of preemption will leave plaintiffs without a remedy.

3. *Preemption also applies to the push mode claims of railroad worker plaintiffs.*

Plaintiffs include railroad workers who have sued separately under the Federal Employers' Liability Act (Railroads) (45 U.S.C. § 51 et seq.; FELA). The question presented with respect to those claims in this writ proceeding is whether the railroad worker plaintiffs stand on different footing than the other plaintiffs. It appears they do not.

█ "To prevail on a FELA claim, a plaintiff must 'prove the traditional common law elements of negligence: duty, breach, foreseeability, and causation.' " (*Adams v. CSX Transp., Inc.* (6th Cir. 1990) 899 F.2d 536, 539, quoting *Robert v. Consolidated Rail Corp.* (1st Cir. 1987) 832 F.2d 3, 6.) Here, the principles that support preemption as to the passenger plaintiffs apply with the same force to the claims of the railroad worker plaintiffs. (*Waymire v. Norfolk and Western Ry. Co.* (7th Cir. 2000) 218 F.3d 773, 777.) Consequently, the railroad worker plaintiffs push mode claims brought under the FELA are indistinguishable from those of the passenger plaintiffs brought under state negligence law.

## DISPOSITION

The order to show cause is discharged. The petition for writ of mandate is granted. Let a peremptory writ of mandate issue directing respondent superior court to vacate the order of June 1, 2007, and to conduct further proceedings in accordance with the views expressed in this opinion. Petitioners shall recover their costs in this proceeding. (Cal. Rules of Court, rule 8.490(m).)

Croskey, J., and Aldrich, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied September 17, 2008, S165091.